Not For Publication

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | | |
|---|---|---|---|
| IN RE: | ) | CASE NO. | 04-30417 (LMW) |
| | ) | | |
| THE HOMESTEADS COMMUNITY AT | ) | CHAPTER | 7 |
| NEWTOWN, LLC, | ) | | |
| | ) | | |
| DEBTOR. | ) | ECF NOS. | 448, 460, 464 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | | | |
|---|---|---|---|
| IN RE: | ) | CASE NO. | 04-32365 (ASD) |
| | ) | | |
| NUEVO PUEBLO, LLC, | ) | CHAPTER | 7 |
| | ) | | |
| DEBTOR. | ) | ECF NOS. | 395, 398 |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


**APPEARANCES**


Ronald I. Chorches, Esq.                    Chapter 7 Trustee for Debtor Homesteads
Law Offices of Ronald I. Chorches, LLC        Community at Newtown, LLC
449 Silas Deane Highway, 2nd Floor
Wethersfield, CT 06109


William S. Fish, Jr., Esq.                 Attorney for Trustee Ronald I. Chorches
Amy E. Markim, Esq.
Hinckley, Allen & Snyder, LLP
20 Church Street, 18th Floor
Hartford, CT 06103


Roberta Napolitano, Esq.                   Chapter 7 Trustee for Debtor Nuevo
P.O. Box 9177                                 Pueblo, LLC
Bridgeport, CT 06601


Dean W. Baker, Esq.                        Attorney for Trustee Roberta Napolitano
Law Office of Dean W. Baker
195 Church Street, 8th Floor
New Haven, CT 06510

| Patrick W. Boatman, Esq. | Attorney for Debtors Homestead Community |
| Law Offices of Patrick W. Boatman, LLC | Community at Newtown, LLC and |
| 111 Founders Plaza, Suite 1000 | Nuevo Pueblo, LLC |

Gary F. Sheldon, Esq.                     Attorney for KBE Building Corporation
McElroy, Deutsch, Mulvaney &              (f/k/a Konover Construction Company, Inc.)
  Carpenter/PH, LLP
One State Street
Hartford, CT 06103

Douglas S. Skalka, Esq.                   Attorney for Franklin Construction, LLC;
Nancy B. Kinsella, Esq.                    Mix Avenue, LLC; Eli Whitney, LLC; and
Jane E. Ballerini, Esq.                    New Haven Mortgage Refinance, LLC
Neubert, Pepe & Monteith, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510

Nicole Liguori Micklich, Esq.             Attorney for Andrews Construction Co., LLC
Garcia & Milas, P.C.
44 Trumbull Street
New Haven, CT 06510

Vincent M. Marino, Esq.                   Attorney for the Town of Newtown
Cohen and Wolf, P.C.
1115 Broad Street
Bridgeport, CT 06604

Thomas J. O'Neill, Esq.                   Attorney for Paragon Realty Group, LLC
Day Pitney, LLP
One Canterbury Green
Stamford, CT 06901-2047


## PARTIAL MEMORANDUM OF DECISION AND ORDER RE: TRUSTEES' JOINT MOTION FOR APPROVAL OF GLOBAL COMPROMISE

Lorraine Murphy Weil, United States Bankruptcy Judge


The matters before the court relate to a certain "global compromise" (the "Global Compromise") reached among the chapter 7 trustees (collectively, the "Trustees," individually, the

"HCN Trustee" or the "NP Trustee" (as the case may be)) appointed and duly serving in the two above-referenced cases, certain creditors in those cases and certain professional administrative expense claimants in those cases.  In each chapter 7 case, the respective Trustee has filed a motion to approve the Global Compromise.  In each chapter 7 case, the debtor (collectively, the "Debtors," individually, the "HCN Debtor" or the "NP Debtor" (as the case may be)) has filed an objection to that motion.[1]  With the consent of the parties and the Honorable Albert S. Dabrowski (presiding judge with respect to Case # 04-32365), proceedings herein with respect to the Global Compromise have been dealt with by the undersigned on a consolidated basis in both chapter 7 cases.  (*See* Oral Record of 6/1/2011 Hearing at 12:13:12 *et seq.*)  This court has jurisdiction over these matters as core proceedings pursuant to 28 U.S.C. §§ 157(b) and 1334(b) and that certain Order dated September 21, 1984 of this District (Daly, C.J.).[2]  This memorandum constitutes the findings of fact and conclusions of law to the extent mandated by Rule 52 of the Federal Rules of Civil Procedure (made applicable here by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure).

---

[1]     In the HCN Case (as hereafter defined), on November 10, 2004, Paragon Realty Group LLC ("Paragon") filed an a application for payment of an alleged administrative expense. (*See* Case # 04-30417 ECF No. 113.)  A hearing on that application was marked off with right of reclaim on March 30, 2005 and the application has not been reclaimed to the court's calendar.  On January 28, 2005, Paragon also filed a "proof" of administrative claim.  (*See id.* Claims Register (POC No. 21).)  On May 27, 2011, Paragon filed an objection to the Global Compromise.  (*See* Case No. 04-30417 ECF No. 460, the "Paragon Objection.")  However, as the record will support, Paragon has failed to prosecute its objection.  For that reason, a separate order will issue overruling the Paragon Objection.

[2]     That order referred to the "Bankruptcy Judges for this District" *inter alia* "all proceedings arising under Title 11, U.S.C. , or arising in . . . a case under Title 11, U.S.C. . . . ."

## I.    PROCEDURAL BACKGROUND

### A.    Relevant Bankruptcy Cases

There are three bankruptcy cases relevant to the Global Compromise (at least for background purposes):  Case No. 04-30417 (the "HCN Case");[3]  Case No. 04-32365 (the "NP Case"); and Case No. 04-34262 (the "THN Case").[4]

### 1.    The HCN Case

Relevant procedural background for the HCN Case through September 12, 2007 is set forth in the Prior Opinion and is incorporated herein by reference.  *See Konover*, 390 B.R. at 35-37.  On July 28, 2009, Michael J. Daly was terminated as chapter 7 trustee in the HCN Case and Richard M. Coan was appointed in his place.  (*See* Case # 04-30417 ECF No. 388.)  On August 3, 2009, Ronald I. Chorches became the HCN Trustee in place of Attorney Coan.  (*See id.* ECF No. 390.)  On October 22, 2009, the HCN Trustee filed a certain Motion for Court Approval of the Use of Estate Funds for the Purpose of Mediation.  (*See id.* ECF No. 393.)  That motion sought the court's approval to compensate a mediator (the "Mediator") from estate funds with respect to a proposed mediation (the "Mediation") of the disputes between the HCN Trustee and Konover Construction Corporation (n/k/a KBE Building Inc., "Konover")  in *Daly v. Konover Construction Corp.*, A.P.

---

[3]    The HCN Case is referred to in *Daly v. Konover Construction Corp. (In re The Homesteads Community at Newtown, LLC),* 390 B.R. 32 (Bankr. D. Conn. 2008) (the "Prior Opinion") as "This Case." (*See id.*)  All capitalized terms used but not otherwise defined herein have the respective meanings ascribed to the same in the Prior Opinion.

[4]    The debtor in the THN Case is referred to hereafter as the "THN Debtor."  The THN Case is referred to in the Prior Opinion as the "Homesteads Case."  *See Konover*, 390 B.R. at 40. References herein to the record of each of the three cases appear in the following form:  "Case # _____ ECF No. _____."  References herein to the record of the various relevant adversary proceedings appear in the following form: "A.P. # _____ ECF No. ___."

No. 04-3037 (the "Konover Adversary Proceeding").[5]  That motion was granted by order dated November 19, 2009.  (*See id.* ECF No. 404.)

On April 29, 2011, the Trustees filed that certain Trustees' Joint Motion for Approval of Global Compromise with KBE Building Company, Inc. F/K/A Konover Construction Corp., Franklin Construction, LLC and Other Parties in Interest.  (*See* Case # 04-30417 ECF No. 448, the "HCN Compromise Motion.")  On June 1, 2011, the Debtors filed that certain Debtors' Objection to Trustees' Joint Motion for Approval of Global Compromise.  (*See id.* ECF No. 464, the "HCN Compromise Objection.")  On June 29, 2011, the Trustees and the Debtors filed a Joint [Factual] Stipulation in connection with the HCN Compromise Motion and the HCN Compromise Objection. (*See id.* ECF No. 466, the "HCN Stipulation.")  All the above-referenced matters in HCN Case came on for hearing (the "Hearing") on June 28, 2011.  At the conclusion of the Hearing, the HCN Compromise Motion, the HCN Compromise Objection and the Paragon Objection were taken under advisement (subject to briefing, which now is completed, and subsequent proceedings, discussed below).

### 2.    The NP Case

Relevant background for the NP Case through September 12, 2007 is set forth in the Prior Opinion and is incorporated by reference herein.  *See Konover*, 390 B.R. at 37-40.  On March 14, 2010, the NP chapter 11 trustee filed a motion to convert the NP Case to a case under chapter 7 of the Bankruptcy Code.  (*See* Case # 04-32365 ECF No. 357.)  That motion was granted and the NP Case was converted to a chapter 7 case by order dated April 15, 2010. (*See id.* ECF No. 362.)  The

---

[5]     The Konover Adversary Proceeding is referred to in the Prior Opinion as "This Adversary Proceeding."  *See Konover*, 390 B.R. at 41.

NP chapter 11 trustee became the NP Trustee.  On June 9, 2010, Mix Avenue, LLC ("Mix") filed a motion to have its allegedly secured claim paid from the proceeds of the sale of the NP Property (as hereafter defined).  (*See id.* ECF No. 381.)  The NP Debtor objected to that motion.  (*See id.* ECF No. 386.)  Hearing on the motion (and objection) were continued from time to time until March 17, 2011, when it was marked off without prejudice.

On April 29, 2011, the Trustees filed a duplicate of the HCN Compromise Motion in the NP Case.  (*See* Case # 04-32365 ECF No. 395, the "NP Compromise Motion," collectively with the HCN Compromise Motion, the "Joint Compromise Motion.")  The NP Debtor filed an objection to the NP Compromise Motion on June 1, 2011.  (*See id.* ECF No. 398, the "NP Compromise Objection," collectively with the HCN Compromise Objection, the "Compromise Objection.")  Those two matters first came on for a hearing on June 2, 2011.  The Trustees and the Debtors filed a duplicate of the HCN Stipulation in connection with the NP Compromise Motion and the NP Compromise Objection on June 28, 2011.  (*See id.* ECF No. 400, collectively with the HCN Stipulation, the "Stipulation.")[6]  Those matters were litigated at the Hearing and, at the conclusion thereof, were taken under advisement (subject to briefing, which now is complete, and subsequent proceedings, discussed below).[7]

---

[6]      By its terms, the Stipulation binds only the parties thereto (and not, for example, Konover).

[7]      At the Hearing, Gary F. Sheldon, Esq. (litigation counsel for Konover), and each of the Trustees testified in support of the Joint Compromise Motion.  There were no other witnesses. A copy of the transcript (the "Transcript") of the Hearing appears in the record of the HCN Case as ECF No. 501.  Both the Trustees and the Debtors introduced documentary evidence into the record at the Hearing.  Reference to those exhibits appear herein in the following form:  "Trustees Exh. __" or "Debtors Exh. __" (as the case may be).

Post-hearing briefs in support of the Global Compromise were filed by the following entities:

### 3.    The THN Case

Relevant history with respect to the THN Case is set forth in the Prior Opinion which is incorporated by reference herein. *See Konover*, 390 B.R. at 40-42. As noted therein, the THN Case was closed with no relevant distributions to creditors.

### B.    Relevant Adversary Proceedings, Claims and Objections

The relevant adversary proceedings discussed below are: the Konover Adversary Proceeding; A.P. No. 04-3038 (the "Franklin Adversary Proceeding"); A.P. No. 04-3039 (the "Mix Adversary Proceeding"); and A.P. No. 04-3048 (the "Eli Whitney Adversary Proceeding"). Relevant claims (and claims objections) also are discussed below.

### 1.    The Konover Adversary Proceeding and Claims

#### a.    The Konover Claims

As discussed in the Prior Opinion, in addition to its proof of claim filed in the HCN Case, on August 10, 2010 Konover timely filed a proof of unsecured claim in the NP Case in the amount of $1,290,606 (plus legal fees and interest incurred from October 20, 1999 to February 2, 2004) on the theory that the HCN Case and the NP Case should be substantively consolidated. (*See id.* POC No. 10-1.)[8]

---

briefs filed by the Trustees (*see* # 04-30417 ECF Nos. 481 and 493); joint briefs filed by Eli Whitney (as hereafter defined), Franklin (as hereafter defined), Mix and NHMR (as hereafter defined) (*see id.* ECF Nos. 479 and 495); a brief filed by Andrews (as hereafter defined) (*see id.* ECF No. 480); and a brief filed by Konover (*see id.* ECF No. 489). The Debtors filed post-hearing briefs in opposition to the Global Compromise. (*See id.* ECF Nos. 482, 491, 492.)

[8]    *See* part B.5., below.

- 7 -

b.    **The Konover Adversary Proceeding**

Relevant background for the Konover Adversary Proceeding through the issuance of the Prior Opinion is set forth therein and is incorporated by reference herein.  On July 2, 2009, a default for failure to plead was entered against the HCN Trustee with respect to the Counterclaim.  (*See* A.P. # 04-3037 ECF No. 136.)   On October 28, 2009, the HCN Trustee was substituted for his predecessor as plaintiff.  (*See id.* ECF No. 160.)  By a consent order dated January 28, 2010, the Konover Adversary Proceeding was referred to the Mediation.  (*See id.* ECF No. 162.)  On March 8, 2010, a "no settlement" report was filed by the Mediator with respect to the Mediation.  (*See id.* ECF No. 164.)

On May 14, 2010, the HCN Trustee filed that certain Motion for Summary Judgment Concerning Count Six of the Amended Complaint.  (*See* A.P. # 04-3037 ECF No. 180, collectively with ECF Nos. 181 and 184, the "S/J Motion.")[9]  On July 16, 2010, the HCN Trustee filed a motion to set aside the Clerk's entry of default referred to above, and a Motion To Dismiss or Strike the Counterclaim.  (*See id.* ECF Nos. 203, 204.)  The hearing on those two motions was continued from time to time until September 15, 2010, when that hearing was marked off.  The time for Konover to respond to the motion to dismiss or strike and to the S/J Motion was extended from time to time, the last dates set being February 23, 2011 (with respect to the motion to dismiss or strike) and March 14, 2011 (with respect to the S/J Motion).  (*See id.* ECF Nos. 240, 241.)

On February 16, 2011, Konover (with the consent of the HCN Trustee) filed that certain Motion, on Consent, To Vacate Existing Pre-Trial Order, Adjourn Trial Date *Sine Die,* and Stay

---

[9]    The S/J Motion sought disallowance of Konover's claim against the HCN estate.  (*See id.*)

Further Proceedings Pending Consideration of Rule 9019 Compromise and Settlement (A.P. # 04-3037 ECF No. 245).  On February 18, 2011, the court entered an order granting that motion by (a) staying all proceedings (including discovery) in the Konover Adversary Proceeding and (b) directing that, within thirty (30) days, a motion under Rule 9019 of the Federal Rules of Bankruptcy Procedure be filed seeking approval of a proposed compromise of the Konover Adversary Proceeding or, if no such motion was filed, that the parties contact chambers immediately to arrange for a prompt scheduling/status conference.  (*See id.* ECF No. 247.)  No such conference was scheduled, but, as noted above, the HCN Compromise Motion was filed on April 29, 2011.

> **2.    The Franklin Adversary Proceeding, the Franklin Claims and the Debtors' Objections Thereto**

> **a.    The Franklin Proofs of Claim**

On June 8, 2004, Greenwich Insurance Company("Greenwich") filed a proof of claim for "money loaned" in the HCN Case asserting a secured claim in respect of a mortgage and note in the amount of $1,877,400.  (*See* Case 04-30417 Claims Register (POC No. 9-1).)  On January 31, 2005, Franklin Construction, LLC ("Franklin") filed an amended proof of claim to reflect Greenwich's assignment of that claim to Franklin but made no other meaningful changes to the proof of claim. (*See id.* (POC No. 23-1).)  On September 16, 2011, Franklin filed a further amended proof of claim stating the principal amount of the claim as $1,249,993.00 and stating prepetition interest in the amount of $421,022.07 for a total of $1,671,015.07 (plus postpetition interest and fees).  (*See id.* Claims Register (POC No. 23-2) (the "Franklin HCN Claim").)[10]

---

[10]    Greenwich/Franklin also filed unsecured claims in the HCN Case.

On March 7, 2005, Franklin filed a proof of claim for "money loaned" in the NP Case asserting an unsecured claim in the amount of $1,400,000.00 (exclusive of interest). (*See* Case # 04-32365 Claims Register (POC No. 3-1).) Franklin filed amendments to that claim on June 27, 2011 and July 27, 2011. (*See id.* (POC Nos. 11-1, 11-2).) Franklin filed a further amended claim on September 16, 2011 asserting an unsecured claim in the amount of $1,733,274.50 (including $1,249,993.00 in principal plus prepetition interest). (*See id.* (POC No. 11-3).)

### b.    The Franklin Adversary Proceeding

The Franklin Adversary Proceeding was commenced by a complaint filed on February 19, 2004 by the HCN Debtor against Greenwich. (*See* A.P. # 04-3038 ECF No. 1 (the "Franklin Complaint").) The Franklin Complaint sought to avoid Greenwich's note and mortgage on the Subject Property as a constructively fraudulent transfer in that "[the HCN] Debtor failed to receive a reasonably equivalent value in exchange for Greenwich's claim . . . and . . . [at the time] the [HCN] Debtor was either insolvent or . . . was rendered insolvent as a result of Greenwich's obligation . . . , " (*id.* at 3). Greenwich filed its answer on April 7, 2004. (*See* A.P. # 04-3038 ECF No. 9.) That answer (among other things) denied the allegations of the Franklin Complaint in material part. (*See id.*) On October 20, 2004, an order issued substituting Franklin for Greenwich as party defendant. (*See id.* ECF No. 28.) On March 23, 2005, an order issued substituting the former HCN Trustee as party plaintiff in lieu of the HCN Debtor. (*See id.* ECF No. 36.) On September 11, 2009, the HCN Trustee filed an appearance in lieu of the former HCN Trustee. (*See id.* ECF No. 99.)

On November 8, 2010, an eleventh amended pretrial order was issued which set a trial date for the Franklin Adversary Proceeding of May 9, 2011. (*See id.* ECF No. 111.) That trial was

marked off with the notation that the matter had been "settled." In subsequent reports and motions to the Court, the former HCN Trustee reported that the settlement of the Franklin Adversary Proceeding might potentially be affected by the outcome of the Konover Adversary Proceeding.

**c.    The Debtors' Objections to Franklin's Claims
and Franklin's Responses**

**(i)    The HCN Case**

On May 23, 2012, the Debtors filed objections to the Franklin claims in each case.

The objection filed in the HCN case alleged as follows:

1.    The claim at issue is overstated in that the principal balance advanced under the Promissory Note, as recited in the Promissory Note, was $1,100,000.00.

2.    In addition, Franklin Construction, LLC acquired this claim while it was in active litigation brought by the Debtor, while the Debtor-in-Possession, on behalf of the estate and not any particular creditor. The price paid was $700,000.00.

3.    By buying the Greenwich Insurance Company claim in this case at a point in time when it was actively being litigated by the Debtor while a Debtor-in-Possession, Franklin Construction, LLC interfered with a business opportunity of the estate for the sole purpose of precluding a reorganization by the Debtor while a Debtor-in-Possession and of assuring the efforts of Franklin Construction, LLC and its affiliates to acquire land and buildings then owned by the Debtor.

4.    In addition, to the extent that the Promissory Note includes a default interest rate that doubles the interest rate from the contract rate of 9% to 18%, said default interest rate constitutes a penalty, unenforceable in law or in equity, is without justification, and if enforced, would constitute an unlawful windfall to Franklin Construction, LLC to the detriment of the Debtor and its remaining creditors.

5.    As Franklin Construction, LLC asserts a secured claim, the secured claim should be limited to the amount of the claim, including default interest, as of the petition date of no more than $1,326,000.00.

6.    In addition, as the facts of the case eight years later now suggests that, as a result of secured obligations senior to that of the Franklin Construction, LLC debt, it was an unsecured or undersecured creditor at the time of the commencement of this case, it is not entitled to collect post-petition interest pursuant to 11 U.S.C. § 506(b) or attorney's fees or other costs.

- 11 -

(Case # 04-30417 ECF No. 506, the "HCN Debtor Franklin Claim Objection.")  The objection

sought "entry of an Order disallowing said claim in any amount beyond $1,326,000.00," (*id.* at 2).

On July 6, 2012, Franklin filed a Response (Case # 04-30417 ECF No. 513, the "Franklin

HCN Response") to the HCN Debtor Franklin Claim Objection.  In the Franklin HCN Response,

Franklin states that the HCN Debtor lacks standing to object to its proof of claim as the HCN estate

is insolvent and the HCN Debtor cannot establish that the estate will yield a surplus after creditors

are paid.  (*See id.* at 1-3.)  Franklin also alleges that "[e]ven if the [HCN] Debtor had standing to file

the Objection, the timing of the Objection is procedurally improper and does nothing but delay this

Court's consideration of the . . . [Joint Compromise Motion]."  (Franklin HCN Response at 3-4.)

Further, Franklin alleges that the objection "restates prior arguments that this Court has already heard

and considered in the context of the . . . [Joint Compromise Motion]."  (*Id.* at 4-6.)  On July 11,

2012, proceedings with respect to the HCN Debtor Franklin Claim Objection and the Franklin HCN

Response were "continued without date" pending a decision with respect to the Global Compromise.

(*See* Case # 04-30417 Docket Entry for 7/11/2012).

### (ii)  The NP Case

The Debtors' claim objection filed in the NP Case alleged as follows:

1.   The claim at issue is overstated in that the principal balance advanced under the Promissory
     Note, as recited in the Promissory Note, was $1,100,000.00.

2.   In addition, Franklin Construction, LLC acquired this claim while it was in active litigation
     brought by the Debtor, while the Debtor-in-Possession, on behalf of the estate and not any
     particular creditor.  The price paid was $700,000.00.

3.   By buying the Greenwich Insurance Company claim in this case at a point in time when it
     was actively being litigated by the Debtor while a Debtor-in-Possession, Franklin
     Construction, LLC interfered with a business opportunity of the estate for the sole purpose
     of precluding a reorganization by the Debtor while a Debtor-in-Possession and of assuring

the efforts of Franklin Construction, LLC and its affiliates to acquire land and buildings then owned by the Debtor.

4.    In addition, to the extent that the Promissory Note includes a default interest rate that doubles the interest rate from the contract rate of 9% to 18%, said default interest rate constitutes a penalty, unenforceable in law or in equity, is without justification, and if enforced, would constitute an unlawful windfall to Franklin Construction, LLC to the detriment of the Debtor and its remaining creditors.

5.    As Franklin Construction, LLC asserts a secured claim,[11] the secured claim should be limited to the amount of the claim, including default interest, as of the petition date of no more than $1,353,775.00.

(Case # 04-32365 ECF No. 432, the "NP Debtor Franklin Claim Objection.")  The objection sought

"entry of an Order disallowing said claim in any amount beyond $1,353,775.00," (*id.* at 2).

On July 6, 2012, Franklin filed a Response (Case # 04-32365 ECF No. 438, the "Franklin

NP Response") to the NP Debtor Franklin Claim Objection.  In the Franklin NP Response, Franklin

states that the objection "delays this Court's consideration of the . . . [Joint Compromise Motion]."

(*Id.* at 1-3.)  The Franklin NP Response further states that the objection "only raises substantive

objections that this Court has already heard evidence on and considered."  (*Id.* at 3-5.)  Finally,

Franklin alleges that "the [NP] estate may be rendered insolvent after the payment of all claims,

administrative fees and costs and [i]n such a situation, the [NP] Debtor has no . . . [standing] to

object to the allowance of claims against the [NP] estate."  (*Id.* at 5-6.)  On July 11, 2012,

proceedings with respect to the NP Debtor Franklin Claim Objection and the Franklin NP Response

were "continued without date" pending a decision with respect to the Global Compromise.  (*See*

Case # 04-32365 Docket Entry for 7/11/2012.)

---

11      As noted above, the claim in the NP Case is an *unsecured* claim.

### 3.    The Mix Adversary Proceeding and Claims

#### a.    The Mix Claims

On January 31, 2005, Mix filed a proof of claim in the HCN Case asserting a claim for "mechanic's lien/stipulation" as a secured claim in the amount of $139,791.67.  (*See* Case # 04-30417 Claims Register (POC No. 25-1).)  On March 7, 2005, Mix filed a proof of claim in the NP Case for "mechanics lien" as a secured claim in the amount of $110,000.00 (exclusive of interest). (*See* Case # 04-32365 Claims Register (POC No. 2-1).)

#### b.    The Mix Adversary Proceeding

The Mix Adversary Proceeding was commenced on February 19, 2004 by the filing of a complaint by the HCN Debtor against Connecticut Business Credit, Inc. (assignor to Mix, "CBC"). (*See* A.P. # 04-3039 ECF No. 1, the "Mix Complaint.")  The Mix Complaint sought to avoid a certain Certificate of Mechanic's Lien in the stated amount of $325,000 with respect to the Subject Property as a constructively fraudulent transfer and/or to reduce the amount of the lien and/or to discharge it in its entirety.  (*See* A.P. # 04-3039 ECF No. 1 at 2-3.)

On March 29, 2004, CBC filed an answer to the Mix Complaint which (among other things) denied the allegations of the Mix Complaint in material part.  (*See id.* ECF No. 7.)  On October 20, 2004, an order issued substituting Mix as party defendant.  (*See id.* ECF No. 30.)  On March 23, 2005, an order issued substituting the former HCN Trustee as party plaintiff.  (*See id.* ECF No. 37.) On September 11, 2009, the HCN Trustee filed a notice of appearance in lieu of the predecessor trustee.  (*See id.* ECF No. 100.)  On November 8, 2010, an eleventh amended pretrial order issued setting a trial date for the Mix Complaint of May 9, 2011.  (*See id.* ECF No. 113.)  That trial was marked off with the notation that the matter had been "settled."  In subsequent reports and motions

- 14 -

to the Court, the former HCN Trustee reported that the settlement of the Mix Adversary Proceeding also may potentially be affected by the outcome of the Konover Adversary Proceeding.

### 4.   The Eli Whitney Adversary Proceeding and Claims

#### a.   The Eli Whitney Claims

On January 31, 2005, Eli Whitney, LLC ("Eli Whitney") filed a proof of claim (as assignee of United Water Connecticut, Inc. ("UWC")) in the HCN Case stating a secured claim for a mechanic's lien in the amount of $240,507.16.  (*See* Case # 04-30417 Claims Register (POC No. 22-1).)  Eli Whitney did not file a proof of claim in the NP Case.

#### b.   The Eli Whitney Adversary Proceeding

The Eli Whitney Adversary Proceeding was commenced on February 25, 2004 by the filing of a complaint by the HCN Debtor against UWC.  (*See* A.P. # 04-3048 ECF No. 1.)  On June 4, 2004, a consent order issued dismissing the first count of that complaint.  (*See id.* ECF No. 18.)  On June 14, 2004, the HCN Debtor filed a proposed amended complaint.  (*See id.* ECF No. 22, the "Eli Whitney Complaint.")  On July 21, 2004, an order issued validating the filing of the Eli Whitney Complaint.  (*See id.* ECF No. 26.)  On November 10, 2004, an order entered substituting Eli Whitney as party defendant.  (*See id.* ECF No. 39.)  On March 23, 2005, an order issued substituting the former HCN Trustee as party plaintiff.  (*See id.* ECF No. 47.)

The Eli Whitney Complaint sought to avoid and/or discharge a Certificate of Mechanic's Lien filed by UWC in the stated amount of $194,567.59 with respect to the Subject Property.  (*See* A.P. # 04-3048 ECF No. 22 at 4-5.)  On April 13, 2006, Eli Whitney filed an answer to the Eli Whitney Complaint which (among other things) denied the allegations of the Eli Whitney Complaint in material part.  (*See* A.P. # 04-3048 ECF No. 50.)  On September 11, 2009, the HCN Trustee filed

- 15 -

an appearance in lieu of the former HCN Trustee. (*See id.* ECF No. 114.) On November 8, 2010, an eleventh amended pretrial order was issued which set a trial date of May 9, 2011. (*See id.* ECF No. 127.) That trial was marked off on May 9, 2011 with the notation that the matter was "settled." In subsequent reports and motions to the Court, the former HCN Trustee reported that the settlement of the Eli Whitney Adversary Proceeding also may potentially be affected by the outcome of the Konover Adversary Proceeding.

> **5.** **The Substantive Consolidation Motions**[12]

As noted in the Prior Opinion, on August 8, 2005 Attorney Daly, in his capacity as the former trustee for each of the estates of HCN and NP filed a motion in the HCN Case to substantively consolidate the two estates. (*See* Case # 04-30417 ECF No. 216 (*i.e.,* the Trustee's First Consolidation Motion).) On August 31, 2005, the movant marked the Trustee's First Consolidation Motion "off with right of reclaim." (*See id.* Docket Entry for August 31, 2005.)

-----

[12]    Substantive consolidation has no express statutory basis but is the product of judicial gloss. The sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors. *In re Augie/Restivo Baking Company, Ltd.,* 860 F.2d 515, 518 (2d Cir. 1988). Substantive consolidation is appropriate when (i) creditors dealt with the entities as a single economic unit and did not rely on their separate identity when extending credit, *or* (ii) the affairs of the debtors are so entangled that consolidation will benefit all creditors. *Id.*

Substantive consolidation permits the court to disregard the separate identity of related debtors and to consolidate and pool their assets and liabilities and treat them as though held and incurred by one entity. *In re Drexel Burnham Lambert Group*, 138 B.R. 723, 764 (Bankr. S.D.N.Y. 1992). "Substantive consolidation creates a single estate for the benefit of all creditors of all of the consolidated corporations and combines such creditors into one creditor body." *Id.* Moreover, in substantive consolidation "inter-entity liabilities [*i.e.,* liabilities between the two "bankrupt" entities] . . . are erased," *In re Owens Corning,* 419 F.3d 195, 205 (3d Cir. 2005). Substantive consolidation does not affect valid liens. *In re AHF Dev., Ltd.*, 462 B.R. 186, 198 (Bankr. N.D. Tex. 2011) ("Substantive consolidation should not affect a validly perfected lien. If a lien is affected, then consolidation should not be ordered.").

As also noted in the Prior Opinion, on August 8, 2005, Attorney Daly in his referenced joint capacity, filed a substantially identical motion in the NP Case to substantively consolidate the two estates. (*See* Case # 04-32365 ECF No. 27 (*i.e.,* the Trustee's Second Consolidation Motion).)[13]  On September 1, 2005, the movant marked the hearing on the Trustee's Second Consolidation Motion "off with right of reclaim."  (*See* Case # 04-32365 ECF Docket Entry for September 1, 2005.)  The Trustee's Consolidation Motion alleged that the two estates should be consolidated for reasons including: the creditors dealt with the debtors as though they were a single unit; and that "the business and financial affairs [of the Debtors] are sufficiently entangled to warrant consolidation." (*Id.* ECF No. 27.)  As noted in the Prior Opinion, Konover also filed a substantive consolidation motion in each of the HCN Case and the NP Case.  (*See* Case # 04-30417 ECF No. 325; Case # 04-32365 ECF No. 258.)  As noted in the Prior Opinion, all the substantive consolidation motions were marked off "with right of reclaim."

## 6.    Proceedings Subsequent To The Hearing

On May 8, 2012, the court issued (in both cases) that certain Order Reopening Proceedings for Non-Evidentiary Hearing.  (*See, e.g.,* Case No. 04-30417 ECF No. 502, the "Further Order.")  In the Further Order, the court listed certain questions (the "Questions") with respect to the Global Compromise and scheduled a non-evidentiary hearing (the "Further Hearing") at which to consider the Questions.  (*See id.*)  On May 23, 2012, the Trustees filed in each case written answers to the Questions.  (*See, e.g., id.* ECF No. 507, the "Trustees' Responses.")  The Further Hearing was convened as scheduled on May 23, 2012 at which the Trustees, the Debtors, Franklin and Konover

---

[13]    The Trustee's two consolidation motions are hereafter referred to collectively as the "Trustee's Consolidation Motion."  The Debtors filed objections to the Trustee's Consolidation Motion.  (*See* Case # 04-30417 ECF No. 226; Case # 04-32365 ECF No. 32.)

appeared and were heard. A transcript of the record of the Further Hearing appears in the record of both cases. (*See, e.g., id.* ECF No. 510, the "Further Transcript.") The Trustees' Responses and relevant statements in the Further Transcript are treated herein as supplements to the Joint Compromise Motion.

## II.    FACTUAL BACKGROUND[14]

### A.    BACKGROUND OF THE PROJECT

These cases have their genesis in the construction and development of an elderly care community in Newtown, Connecticut, known as The Homesteads (the "Project"). The Project was to be developed in phases. Phase one was to be a 100 unit assisted living facility (the "Assisted Living Facility") and phase two was to be a 162 congregate care facility[15] along with 38 age-restricted condominiums. The Assisted Living Facility was to be developed by THN, an affiliate of the HCN Debtor and the NP Debtor, on a 10.4 acre site in Newtown, Connecticut. The remaining aspects of the Project (the congregate care facility and the condominiums) were to be developed on an adjoining 50.9 acre site. Prior to September 27, 1999, John Sedor, Jr., Lillian Sedor Emmons,

---

[14]    The facts which follow are taken primarily from the Stipulation (as indicated below) but are subject to the condition that they do not bind Konover or any parties other than the Debtors and the Trustees. (*See supra* n.6.)

[15]

By state regulation, "assisted living services" are defined as nursing services and assistance with activities of daily living provided to clients living within a managed residential community having supportive services that encourage clients primarily age fifty-five (55) or older to maintain a maximum level of independence.

*Antonik v. Greenwich Planning and Zoning Comm'n,* No. CV 98-0163185 S, 1999 WL 391049, at *12 (Conn. Super. Ct. June 4, 1999) (internal quotation marks omitted). "Congregate care" is generally understood to be more supportive than "independent living" but less supportive than "assisted living."

and the Estate of Lillian Hazel Sedor (collectively, the "Sedors") owned the property on which the Project was to be developed (the "Sedor Property"). The Sedor Property consisted of approximately 64 acres located in Newtown, Connecticut, commonly known as 12-16 Pocono Road and 166 Mt. Pleasant Road. (*See* Case No. 04-30417 ECF No. 466 ¶¶ 9-12.)

THN was formed on October 13, 1998. On June 18, 1998,[16] THN submitted to the Town of Newtown Planning and Zoning Commission (the "Commission") an Application for Special Exception (the "Application for Special Exception") from the Town's Zoning Regulations for the following proposed use: "Assisted Living/Independent Living facility that will consist of 100 assisted living units, 160 congregate living units and 38 independent living units and a community center." At or around that time, THN also filed an Application for a 2-Lot Subdivision for Property Located at 12-16 Pocono Road and 166 Mt. Pleasant Road, Newtown, CT concerning the Sedor Property (the "Subdivision Application"). Both the Application for Special Exception and the Subdivision Application were based on an Option to Purchase the Sedor Property held by THN. The Commission granted both the Application for Special Exception and the Subdivision Application on May 20, 1999. The order approving the Subdivision Application separated the Sedor Property into two lots, including a 10.4 acre parcel of land identified as "Lot 1" (the "THN Property") and a 50.9 acre parcel identified as "Lot 2" (*i.e.,* the Subject Property).[17] The Subject Property is commonly known as 12-16 Pocono Road, Newtown, Connecticut. The THN Property is commonly known as

---

[16]    The inconsistency between this date and the foregoing date appears in the Stipulation.

[17]    The terms "the Subject Property" and "Lot 2" are used interchangeably herein. The terms "the THN Property" and "Lot 1" are used interchangeably herein.

166 Mt. Pleasant Road, Newtown, Connecticut.  (*See id.* ¶¶ 13-18.)  A copy of the Subdivision Map

is in the Hearing record as Trustees Exh. 2.

### B.    DEVELOPMENT OF THE PROJECT

On or about June 17, 1999, negotiations between THN and Konover culminated in the

execution of a construction contract (the "June 17th Contract") in the amount of $11,326,850, the

subject of which was the construction of the Assisted Living Facility on the THN Property.  The only

parties to the June 17th Contract were Konover and THN.  In conjunction with the June 17th

Contract, THN and Konover executed a document entitled "Supplemental Conditions and

Addendum Agreement to Standard Form of Agreement Between Owner and Contractor" dated June

17, 1999 (the "Supplemental Conditions").  Paragraph 11 (a) of the Supplemental Conditions stated

that the obligations of the parties to the June 17th Contract were contingent upon, among other things

"(iii) ownership by the Owner of the fee for all parcels of land on which the Work is to be performed

under the Contract."  (*See* Stipulation ¶¶ 19-22.)

On July 16, 1999, Konover and THN entered into a Memorandum of Agreement for the

Construction of Off-Site Improvements, which called for Konover to perform certain work outside

of the THN Property.  The Trustees and the Debtors now agree that none of the off-site work was

to be performed on the Subject Property (but Konover disputes that).  The construction of the

Assisted Living Facility was to be financed by HUD.  The June 17th Contract was on HUD forms

prepared by Konover and was subject to HUD requirements.  HUD required that the THN Property

be acquired, developed and financed completely separately from the condominium/congregate living

project on the Subject Property.  In accordance with those HUD requirements, on or about August

19, 1999, Linda Silberstein filed organizational papers for the HCN Debtor with the Connecticut

Secretary of State for the purpose of purchasing and developing the Subject Property separately from

THN's development of the Assisted Living Facility on the THN Property.  On September 28, 1999,

the HCN Debtor acquired the Subject Property from the Sedors.  Also on or about September 28,

1999, in a separate transaction, THN acquired the THN Property from the Sedors.  (*See id.* ¶¶ 23-30.)

On or about October 7, 1999, Konover and THN entered into a Memorandum of Agreement

(the "Memorandum of Agreement").  Konover and THN acknowledged in the Memorandum of

Agreement that (a) the June 17th Contract was "for the construction of a 100-Unit Assisted Living

Facility" on the THN Property; (b) HUD had delayed the closing of the Arbor (as hereafter defined)

loan to October 27, 1999; and (c) fee ownership of the THN Property had been acquired on

September 27, 1999.  Copies of the Executor's Deed and Warranty Deed relating solely to the THN

Property from the Sedors to THN were attached to the Memorandum of Agreement as Exhibit II.

(*See id.* ¶¶ 31-32.)

On or about October 27, 1999, THN closed the HUD construction loan in the amount of

$15,757,200 with Arbor National Commercial Mortgage ("Arbor") in order to fund the construction

of the Assisted Living Facility on the THN Property.  The sole borrower on the Arbor loan was THN.

The mortgage securing the Arbor loan did not include the Subject Property.  The HCN Debtor was

not a guarantor of the Arbor loan.  On October 27, 1999, the day of the closing of the Arbor loan,

Konover and THN executed a replacement construction contract (the "Oct. 27th Contract").  The

contract price in the Oct. 27th Contract was again $11,326,850, and it called for Konover to construct

the Assisted Living Facility on the THN Property.  The HCN Debtor was not a party to the Oct. 27th

Contract.  The Oct. 27th Contract superceded the June 17th Contract.  Konover began constructing

the Assisted Living Facility on or about October 20, 1999.  That work began approximately five

months after the Sedor Property had been subdivided and several weeks after the HCN Debtor had

purchased the Subject Property.  (*See* Stipulation ¶¶ 33-42.)

On or about March 20, 2000, the HCN Debtor took out its own separate $3.7 million

construction loan from New Haven Savings Bank ("NHSB") to fund the construction of the HCN

Debtor's project on the Subject Property.[18]  The NHSB loan was not a HUD loan.  The HCN Debtor

was the sole borrower on the NHSB loan, and the Silbersteins and the NP Debtor served as

guarantors.  THN was not a borrower or guarantor of the NHSB loan, and the THN Property did not

serve as collateral for the loan.  The HCN Debtor then commenced construction of condominiums

on the Subject Property using a general contractor that was unrelated to Konover.  Konover was not

involved in the construction of the project on the Subject Property, but was aware of it.  (*See*

Stipulation ¶¶ 43-48.)

Konover and THN became involved in a dispute concerning payment and on or about May

16, 2001, Konover recorded a blanket mechanic's lien (the "Konover Mechanic's Lien") in the

amount of $1,290,606 covering both the THN Property and the Subject Property.  Konover had never

requisitioned or otherwise billed the HCN Debtor for Konover's work or demanded payment from

the HCN Debtor at any time prior to recording the Konover Mechanic's Lien.  All of Konover's

requisitions for payment were directed to THN.  THN paid Konover many millions of dollars from

the Arbor construction loan through the requisition process.  The HCN Debtor and Konover were

never parties to any mutual written contract between them.  (*See id.* ¶¶ 49-53.)

---

[18]      By assignment dated June 17, 2002, the NHSB loan was assigned to New Haven
Mortgage Refinance, LLC ("NHMR"). (*See* Case No. 04-30417 ECF No. 295 at 2.)

The HCN Debtor alleged that Konover had no legal basis to file the Konover Mechanic's Lien on the Subject Property and that the Konover Mechanic's Lien should have been limited to the THN Property. The HCN Debtor further alleged that as a result of the Konover Mechanic's Lien's being wrongfully filed against the Subject Property by Konover, the HCN Debtor's development of the Subject Property was severely disrupted and that ultimately the HCN Debtor had to file bankruptcy. The HCN Debtor further alleged that all of the foregoing resulted in the destruction of its business. (*See id.* ¶ 54.) The foregoing was the basis for the Konover Adversary Proceeding. (*See* A.P. # 04-3037 ECF No. 1.)

## C.    Relevant Claims

### 1.    The HCN Case

As discussed in the Prior Opinion, on March 3, 2005, the former HCN Trustee filed a motion to sell the Subject Property free and clear of all liens, claims and encumbrances for $8,900,000, which was subsequently granted by an order of the court entered on April 15, 2005.[19] After prior distributions from the sale proceeds previously approved by the Court, the HCN Trustee is currently holding approximately $2,787,227 in net proceeds (the "HCN Cash Proceeds") from the sale of the Subject Property.[20] The Town of Newtown asserts a first priority secured claim against the HCN

---

[19]    At that time, that Trustee appears to have believed that a distribution to unsecured creditors in the case was probable. As is apparent from the remainder of this opinion, the HCN Trustee does not now share that belief.

[20]    The cash proceeds in both cases effectively are earning "negative interest." That is because "[b]ased on the unprecedented drop in interest rates and other factors currently affecting the economy, the banks are *charging* the Trustees interest for keeping . . . [those] funds in the bank." (*See* Case # 04-30417 ECF No. 481 at 4 n.2.) That is a common problem among bankruptcy trustees at this time. (*See, e.g.,* Order Authorizing Trustee To Pay Bank Service Charges and Fees Incurred by the Estates Accounts (Bankr. S.D. Cal. Aug. 9, 2011); Order Authorizing Chapter 7 Trustees To Pay Bank Service Charges and Fees Incurred by Chapter 7 Estate Accounts (Bankr. D. Kan. June 30,

- 23 -

Cash Proceeds in the amount of $99,000. The HCN Trustee does not object to that claim. NHMR asserts a senior secured claim against the HCN Cash Proceeds in the amount of $336,513.65, exclusive of additional interest and fees, which claim was allowed by order (*id.* ECF No. 318) of this court dated December 15, 2006. (*See id.* ECF No. 466 ¶¶ 75-78.)

As discussed above, Konover filed a timely (but disputed) proof of claim in the HCN Case asserting a secured claim in the amount of $1,290,606 plus interest and legal fees. Konover alleges that the total amount of its secured claim including interest and legal fees exceeds $2,800,000 (*i.e.,* the amount of the HCN Cash Proceeds). As discussed above, Franklin also asserts a senior secured claim against the HCN Cash Proceeds. As further discussed above, that claim is based on a secured proof of claim filed by Greenwich in the amount of $1,877,400, as amended by a proof of claim filed by Franklin. (*See id.,* Claims Register (POC Nos. 9, 23).) The debt originally owed to Greenwich was incurred in connection with a bond issued for the construction of the Assisted Living Facility and the Arbor mortgage (*i.e.,* with respect to the THN Property). The HCN Debtor and the NP Debtor are each accommodation parties on that debt. If the claim of Konover were disallowed in full, the Franklin claim would be a third priority secured claim against the HCN Cash Proceeds (subordinate only to the claims of the Town of Newtown and NHMR). If, on the other hand, the secured claim asserted by Konover were not disallowed, then the NHMR secured claim and the Franklin secured claim likely would be subordinate to the Konover secured claim (and the tax lien). (*See id.* ECF No. 466 ¶¶ 79-82.)

Andrews Construction Company, Inc. and Kerschner Development Company, LLC (collectively, "Andrews") also asserted secured claims senior to Konover, Franklin and NHMR in

---

2011).)

- 24 -

an amount in excess of $400,000 and filed proofs of claim to that effect.  (*See id.*, Claims Register

(POC Nos. 26, 27).)  These claims allegedly were secured by certain fixtures located at the Subject

Property, and Andrews asserts that the secured claims attach to the HCN Cash Proceeds.  On October

20, 2010, the HCN Trustee objected to Andrews' claims.  (*See id.* ECF Nos. 425, 426.)  On February

25, 2011, the HCN Trustee filed a motion to compromise the Andrews' secured claims for a total

payment of $20,000 from the HCN Cash Proceeds.  That motion to compromise was approved by

this Court on March 23, 2011.  (*See* Stipulation ¶ 83; *see also* Case # 04-30417 ECF No. 445, the

"Andrews Settlement.")

Various professionals in the Chapter 7 case of the HCN Debtor assert administrative expense

claims against the HCN Cash Proceeds as follows:

> Hinckley Allen & Snyder, LLP: greater than $210,000[21]
> Reid and Riege, P.C.: greater than $10,000
> Andrew Brand: greater than $100,000
> Trustee/Chapter 7 Administrative Fees: greater than $300,000.

(*See id.* ECF No. 466 ¶ 84.)[22]

## 2.    **The NP Case**

The NP Debtor owned property at 164, 168 and 170 Mt. Pleasant Road, Newtown,

Connecticut (the "NP Property").  As discussed in the Prior Opinion, on January 17, 2007, the Court

approved the sale of the NP Property by the NP Trustee free and clear of all liens, claims, and

---

[21]        (*See id.* ECF No. 481 at 8 n.5.)

[22]        As noted above, Mix also filed a (disputed) secured claim in the HCN Case in the
amount of $139,791.67.  As discussed below, as part of the Global Compromise, no distribution will
be made on that claim.  Also as noted above, Eli Whitney filed a proof of (disputed) secured claim
in the amount of $240,507.16.  As discussed below, as part of the Global Compromise, no
distribution will be made on that claim.

- 25 -

encumbrances for the sum of $1,410,000. After prior distributions from that amount that the Court previously approved, the NP Trustee is currently holding approximately $1,134,063 in net proceeds (the "NP Cash Proceeds") from the sale of the NP Property. (*See id.* ¶ 85.)

Konover timely filed a (disputed) proof of claim in the NP Case, asserting an unsecured claim against the NP Debtor in the amount of $1,290,606 plus prepetition interest and legal fees. NHMR asserts a senior secured claim against the NP Cash Proceeds in the amount of $336,513.65, exclusive of additional interest and fees. The Global Compromise provides that such claim would be fully paid and satisfied out of the HCN Cash Proceeds since the HCN Debtor is the primary obligor on this claim. As discussed above, Mix asserts a secured claim against the NP Cash Proceeds in the amount of $110,000 plus interest. The State of Connecticut has two minor claims against the NP Debtor that are expected to be paid in full:  $745.00 priority claim and $580.00 administrative claim. (*See id.* ¶¶ 86-89.)[23]

Exclusive of administrative expense claims and the unsecured claim of Konover, the remaining unsecured claims against the NP Debtor are comprised of the following unsecured claims held by only three (unsecured) creditors:  Franklin in the amount of $1,400,000 (plus pre-petition interest); Transport International Pool in the amount of $12,275.06; and SNET Company in the amount of $29,961.37 (collectively, the "NP Unsecured Creditors"). To the extent the NP Debtor

---

[23]    On January 19, 2005, NHMR filed a proof of secured claim in the NP Case in the amount of $4,776,450.41 (plus interest and fees). (*See* Case # 04-32365, Claims Register (POC No. 1).)  Eli Whitney did not file a proof of claim in the NP Case.

is solvent, the NP Unsecured Creditors would be entitled to post petition interest under 11 U.S.C.

§ 726. (*See* Stipulation ¶¶ 90-91.)[24]

## III.    THE GLOBAL COMPROMISE

The Global Compromise's effect on the HCN Case and the NP Case is discussed below.

### A.    The HCN Case

The Global Compromise's effect on the HCN Case is summarized as follows.

- *Konover* - the HCN Trustee proposes to fully and finally settle the Konover Adversary Proceeding for a cash payment of $450,000 to Konover.

- *The Affiliates Franklin, Mix, Eli Whitney and NHMR* - the HCN Trustee proposes to dismiss with prejudice the Franklin Adversary Proceeding, the Mix Adversary Proceeding and the Eli Whitney Adversary Proceeding.  No distribution will be made from the HCN estate to Mix or Eli Whitney.  However, distribution will be made to their affiliates as follows: (a) Franklin in the amount of $1,354,213.40[25] and (b) NHMR in the amount of $336,513.65 (additional interest and fees are waived).[26]

- *Town of Newtown* - secured tax claim in the amount of $99,000 paid in full (additional interest is waived).[27]

- *Andrews* - $20,000 paid in full pursuant to the Andrews Settlement.

- *Professional Fees* - professionals are taking substantial reductions in their fees and would be paid as follows:

---

[24]     This paragraph has been substantially changed pursuant to the Trustees' Responses and the Further Transcript as discussed in part III.B., below.

[25]     That amount has been adjusted downward from $1,384,213.40 as explained in the Trustees' post-trial brief (*See* Case # 04-30417 ECF No. 481 at 8 n.5.)  Franklin will have an allowed claim in the HCN Case in the amount of $1,249,993 plus interest to the petition date for a total of $1,671,015.07.  (*See id.* ECF No. 507 at 2-3 (response No. 9).)  The HCN Trustee ascribes no particular value to the treatment of Mix and Eli Whitney pursuant to the Global Compromise. Accordingly, neither will the court.

[26]     (*See* Transcript at 97:17–98:3 (testimony of HCN Trustee).)

[27]     (*See* Transcript at 97:3-6 (testimony of HCN Trustee).)

| | |
|---|---|
| Hinckley Allen: | $190,000[28] |
| Reid & Riege: | $ 10,000 |
| Chorches Law Firm: | $ 10,000 |
| Andrew Brand: | $ 60,000 |
| HCN Trustee Fee: | $250,000 |
| | $520,000 |

However, payment would be conditioned upon (and limited by) court orders approving fee applications. If the sum of approved fees is less than $520,000, the balance will be paid to Franklin.

- *Contingency Reserve* - $7,500 to be disbursed to Franklin to the extent unused.

- *HCN's Claims Against NP* - waived and released.[29]

- *Summary of Disbursements from HCN Cash Proceeds*

| | |
|---|---|
| Town of Newtown: | $     99,000.00 |
| NHMR: | $   336,513.65 |
| Andrews: | $     20,000.00 |
| Konover: | $   450,000.00 |
| Franklin: | $1,354,213.40 |
| Professional Fees: | $   520,000.00 |
| | $2,779,727.05 |
| Contingency Reserve | 7,500.00 |
| | $2,787,227.05 (approximate amount of HCN Cash Proceeds) |

## B.  The NP Case

The Global Compromise's effect on the NP Case is summarized as follows:

- *Claims of Konover, NHMR and Mix* - withdrawn.[30]

---

[28]      That amount has been adjusted upward as explained in the Trustees' post-trial brief. (*See* Case # 04-30417 ECF No. 481 at 8 n.5.)

[29]      (*See* Case # 04-30417 ECF No. 507 at 3 (Response No. 11).)

[30]      The NP Trustee ascribes no particular value to the withdrawal of the Mix claim. Accordingly, neither will the court. The NHMR claim will be paid from the estate of HCN, the primary debtor on the guaranteed debt.

- *Franklin Claim* - Franklin will have an allowed general unsecured claim in the NP Case in the amount of "$1,249,993 plus interest to the petition date for a total of $1,733,274.50." (Case # 04-30417 ECF No. 507 at 1 (Response No. 2).)  There will be a credit against Franklin's claim as follows: "[p]rior to distribution from the NP Case, . . . there will be a pay down of approximately $670,000 from the HCN Case on th[at] . . . initial allowed amount, leaving a claim balance of approximately $1,063,000.00 in the NP Case." (*Id.* (Response No. 3.a).)

- *NP's Claims Against HCN* - waived and released.[31]

- *NP Cash Proceeds* - to be paid first to priority and administrative claimants, then a one-hundred (100%) percent dividend to general unsecured creditors other than Franklin, with the remainder distributed to Franklin.[32]

## IV.    DEBTORS' COMPROMISE OBJECTION

The Debtors characterize the Global Compromise as "a gross giveaway in favor of . . . [Konover] but primarily in favor of . . . [Franklin], but another of the Tagliatella entities that since 2002 have attempted to appropriate all of the Debtors' property or the proceeds thereof to themselves." (Case # 04-30417 ECF No. 464 at 1.)  With respect to the Konover Mechanics Lien, the Debtors argue that "the . . . [Konover Mechanic's Lien] as it relates to the . . . [Subject Property] was from the beginning and remains a void encumbrance on the . . . [Subject Property] . . . but it was sufficient to bring the . . . [HCN] condominium project to a screeching halt." (*See id.* at 3.)  The Debtors also criticize the HCN Trustee for not having prosecuted the S/J motion. (*See id.* at 6.) Further, the Debtors alleges that "[i]f . . . [such] process had been concluded [successfully] in any

---

[31]    (*See* Case # 04-30417 ECF No. 507 at 3 (Response No. 11).)  Such waiver includes the substantive consolidation claims discussed above.

[32]    The original arrangement was for all of NP's general unsecured claims to be paid *pro rata* at the approximate rate of ninety-six (96%) percent. (*See id.* at 2 Response No. 6.)  However, at the Further Hearing Franklin agreed to the priority set forth above. (*See* Case # 04-30417 ECF No. 510 at 19:18–20:17 (interchange between Attorney Fish, Attorney Baker and the court).)

reasonable period of time, it is likely that the . . .[NP] estate would have been solvent with substantial funds to return to the [NP] Debtor [because the Franklin claims would have been paid in full from the HCN estate]." (*Id.* at 7.)

With respect to the Franklin secured claim in the HCN Case (and perhaps the NP Case as well), the Debtors suggest that such claims should be subject to "equitable adjustment . . . based on . . . [Franklin's] obvious abuse of the bankruptcy process . . . ." (Case # 04-30417 ECF No. 464 at 5.)[33]   The Debtor further argues that, even without any "equitable adjustment," the Global Compromise overvalues the Franklin claim in both cases:

> Based on the representations of the Trustees in their motion, the Franklin claim can be a secured claim in an amount no greater than $1,384,213.40, the amount of cash that the . . . [HCN Trustee] proposes to pay to Franklin at the close of the case.   As such, Franklin has no right to post-petition interest or its expenses. Moreover, the disbursement of this amount to Franklin would extinguish its secured claim for all purposes.   Franklin would not be entitled to empty out the Nuevo Pueblo cash drawer.

(*Id.* at 8.)

## V.   **LEGAL STANDARDS**[34]

Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).   The bankruptcy court "may only approve a proposed settlement after an independent determination that it does not 'fall below the lowest point in the range of

---

[33]   The alleged "abuse" by Franklin (and the other members of the so-called "Tagliatella clan") is discussed in the Compromise Objection.   (*See id.* at 3-4.)

[34]   The standing of the Debtors to object to the Global Compromise is dubious. However, even absent objection, the court has a duty to evaluate the reasonableness of proposed settlements.   *See infra.*

reasonableness'." *Nisselson v. Carroll (In re Altman),* 302 B.R. 424, 425 (Bankr. D. Conn. 2003)

(Shiff, J.), *citing In re Best Prods. Co.,* 177 B.R. 791 (S.D.N.Y. 1995), *aff'd,* 68 F.3d 26 (2d Cir.

1995). "[T]he responsibility of the bankruptcy judge . . . is not to decide the numerous questions of

law and fact raised by . . . [the objector] but rather to canvass the issues and see whether the

settlement fall[s] below the lowest point in the range of reasonableness." *Anaconda-Ericsson, Inc.*

*v. Hessen (In re Teltronics Servs., Inc.),* 762 F.2d 185, 189 (2d Cir. 1985) (internal quotation marks

omitted). The burden of persuasion is on the trustee putting forth the proposed settlement. *Martin*

*v. Kane (In re A&C Props.),* 784 F.2d 1377, 1381 (9ᵗʰ Cir.), *cert denied.,* 479 U.S. 854 (1986).

Approval of a settlement rests in the court's sound discretion. *See Newman v. Stein,* 464 F.2d 689,

692 (2d Cir.), *cert. denied,* 409 U.S. 1039 (1972).

 The bankruptcy judge should not simply "'rubber stamp' the trustee's proposal." *Depoister*

*v. Mary M. Holloway Found. (In re Depoister)*, 36 F.3d 582, 587 (7ᵗʰ Cir. 1994). However, "[t]he

[bankruptcy] judge . . . is not to substitute her judgment for that of the trustee, and the trustee's

judgment is to be accorded some deference." *Hicks, Muse & Co., Inc. v. Brandt (Healthco Int'l,*

*Inc.)*, 136 F.3d 45, 50 n.5 (1ˢᵗ Cir. 1998) (internal quotation marks omitted) (alterations in original).

"[C]ourts need not conduct an independent investigation in formulating an opinion as to the

reasonableness of a settlement; rather, they may give weight to the trustee's informed judgment that

a compromise is fair and equitable and to the competency and experience of counsel who support

the settlement." *Altman,* 302 B.R. at 425-26.

> [C]ourts in this Circuit have set forth factors for approval of settlements based on the
> original framework announced [by the Supreme Court] in *TMT Trailer Ferry* [, 390
> U.S. 414 (1968)]. Those interrelated factors are: (1) the balance between the
> litigation's possibility of success and the settlement's future benefits; (2) the
> likelihood of complex and protracted litigation, with its attendant expense,
> inconvenience, and delay . . . ; (3) the paramount interests of the creditors . . . ;

- 31 -

(4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting . . . the settlement; (6) [any] releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.

*In re Iridium Operating LLC*, 478 F.3d 452, 455, 462 (2d Cir. 2007) (citations and internal quotation marks omitted) [(the "*Iridium* Factors")].

*In re Milazzo,* 450 B.R. 363, 375-76 (Bankr. D. Conn. 2011) (Dabrowski, J.) (footnote omitted).

## VI.   RELEVANT HEARING TESTIMONY

### A.   Gary F. Sheldon, Esq.

Attorney Sheldon is an experienced construction lawyer and has represented Konover in these proceedings.  (*See* Transcript at 9:14–10:13 (testimony of Attorney Sheldon).)   Attorney Sheldon represented Konover in the Mediation.   There were two Mediation sessions: one in November, 2009 and a second session in the Spring of 2010.  (*See id.* at 12:17-22.)   Attorney Thomas Gugliotti served as the Mediator.  (*See id.* at 12:22–13:1.)[35]   During the Mediation, Konover served upon counsel for the HCN Trustee a certain Mediation Position Paper of KBE.  (*See* Trustees Exh. 1, the "Mediation Position Statement.")[36]   The Mediation did not *per se* result in a settlement, but months later there was an agreement.   (*See* Transcript at 13:2-8 (testimony of Attorney Sheldon).)  In the Mediation Position Statement, Konover took the position that it had filed a legally valid, first priority mechanic's lien with respect to the Subject Property.  (*See id.* at 13:17-21, 14:13-

---

[35]        Essentially all the disputes between the HCN Debtor and Konover were submitted to the Mediation:  (a) the objection to the validity of the Konover Mechanic's Lien; (b) the HCN Debtor's affirmative claim against Konover for damages; and (c) Konover's claim against the HCN Debtor.  (*See id.* Transcript at 35:12–36:5 (testimony of Attorney Sheldon).)

[36]        The Mediation Position Statement is in the record only as evidence of the position that Konover took, not for the truth, accuracy or legal sufficiency of that position.  (*See* Transcript at 11:14–12:1 (evidentiary argument and court's ruling).)

25.)  Konover claimed in the Mediation that it was owed about $2.9 million on its mechanic's lien

claim: $1.2 million in principal and the remainder for interest and attorney's fees.  (*See id.* at

13:24–14:8.)  If that amount were "run . . . forward" until approximately the date of the Hearing, it

would exceed $3 million.  (*See id.* at 14:9-12 (testimony of Attorney Sheldon).)[37]

Attorney Sheldon explained Konover's position that debt incurred for development of the

THN Property (*i.e.,* Lot 1) was a valid mechanics lien on both that property and the Subject Property

(*i.e.,* Lot 2):[38]

> Q.      . . .  Now, what was to be developed on Lot 1?
>
> A.      [A] 100-unit assisted living facility.
>                          . . .
>
> A.      Lot 2 is all of the land wrapping around the -- the top of Lot 1 [on Trustees
>         Exh. 2].
>
> Q.      And on Lot 2, what was the project to be developed there?
>
> A.      Well, over time, there would be a number of -- of developments, but the most
>         immediately, was a condominium project to be developed within this driveway loop
>         shown in the upper right-hand corner of the property.
>
> Q.      And are there roads that are located on the property as shown on Exhibit 2?
>
> A.      Yes.  The -- the property is bounded by Mount Pleasant Road, which is at the
>         -- the bottom area of the property, and then Pocono Road in the upper right-hand
>         corner of the property.
>
> Q.      And were there access roads that were being . . . constructed in connection
>         with Lots 1 and 2?

---

[37]      Attorney Sheldon also summarized much of the Stipulation.  (*See* Transcript at 15:4-
12 (remarks of Attorney Fish).)

[38]      Attorney Sheldon's testimony differs to some degree from the Stipulation.  That
reflects (as noted above) that Konover is not bound by the Stipulation.

A.      Yes. Konover constructed the . . . main access road that came in from Mount Pleasant to serve both lots, and also constructed a fire access road that ran from Pocono Road through Lot 2 to Lot 1.

Q.      So . . . in your client's view, your client constructed those two roadways?

A.      That's the facts as my client witnesses have presented it.

A.      [The primary access road to Lot 1] . . . is the only . . . vehicular access to the [Sedor Property].  The fire access road is exactly that. It's -- it's meant to be a -- a way by which fire trucks, emergency vehicles, could enter, but it wasn't a driveway, per se.

. . .

A.      . . . Konover entered into two contracts in June and July and then later agreements in October of 1999, which essentially adopted the same scope as those two contracts.  And those two contracts are defined, roughly, as an off-site contract which required the performance of work necessary for the development of the entire project to, essentially, bring utilities from the outside world into the project.  And then the -- the base construction contract, which included the construction of the common improvements such as the -- the driveway, the utilities, grading, landscaping, and that sort, and also the construction of the100-unit assisted living facility on Lot 1.

. . .

Q.      So -- so the two contracts that would be an issue are the so-called "primary contract and the off-site agreement," as reflected on Exhibit 4 to Exhibit . . . [1]?

A.      Yes.

Q      Now, . . . was the . . . [HCN D]ebtor . . . a signatory to either the primary contract or the off-site agreement?

A.      The two contracts were signed under the name -- the Homestead at Newtown [*i.e.,* the THN Debtor], which was the developer of the project.

. . .

Q.      . . . Now, Konover filed a mechanic's lien, as you've testified.  Is that right?

A.      Yes.

. . .

Q.      And was that in May of 2001?

- 34 -

A.      Yes. . . .

Q.      And so the certificate of the mechanic's lien is filed.  Can you tell the Court what properties -- what real properties the lien applied to?

A.      The lien was filed against the entire subdivision [*i.e.,* both Lots 1 and 2].  The Connecticut [G]eneral [S]tatutes provide that a contractor can file a -- a blanket lien against a subdivision, and that's how they proceeded.

. . .

Q.      So -- so when the lien is filed, it's filed on Lots 1 and Lots 2.  Correct?

A.      Yes.

Q.      And at the time the lien is filed, does Konover learn who the owners are, who's on the land records for Lots 1 and Lots 2?

A.      Yes.  They had to do a title search in order to file the lien.  That identified the unit owners that needed to be identified on the mechanic's lien.

Q.      And at the time the lien was filed, who were the two unit owners of Lot 1 and Lot 2? . . .

A.      . . . The -- the public record reflected that the title was held to Lot 1 by the [the THN Debtor] and that the title was held to Lot 2 by the [HCN Debtor].

Q.      Now, you testified that in Konover's view, it had the -- the legal right to lien the entire subdivision, that is Lots 1 and Lots 2.

A.      Correct.

Q.      Now, if I could turn your attention to page 5 of your . . . [Mediation Position Statement].  And the heading there is the project was one integrated elderly care community.  Do you see that?

A.      Yes, I do.

Q.      What -- what's the relevance of that to Konover's legal position that it could lien the entire subdivision?

A.      Well, Konover performed its work in accordance with a contract with the [THN Debtor], who is the developer of the entire project.  It was a single project that just happened to be subdivided into -- into two lots for purposes of -- of

development.  And we were directed to perform  work on both lots by the . . . [THN Debtor].

Q.      So it's -- it's your client's position that work was performed on both Lot 1 and Lot 2.  Is that right?

A.      Yes. . . . [Th]ey state that as a matter of fact.

Q.      And with respect to the work that was physically done on Lot 1, what is your client's position as to whether that was something beneficial or necessary for Lot 2?

A.      Right.  The public record for the approval of this project shows, essentially, that -- that these improvements all needed to be made for the development of either of these properties. . . .

A.      . . . So in order to subdivide the property and in order to obtain the approvals necessary to construct the type of -- of buildings that were being constructed, the -- the planning and zoning agencies of the town of Newtown required that certain work be done in order to obtain that approval.  And those requirements are essentially laid out on what's been labeled as Exhibit . . . [1], the map, the road, the utilities.  This map and related maps show work that needed to be done.  Other maps would show the grading that needed to be done in order to have proper water flow.

[Y]ou could not have built one project and not the other under the approval given by the town. . . .

A.      And -- and the driveway that was being constructed by Konover is the only driveway for the combined project.  You could not have built the condominium units if Konover had not built that road.  The -- the plumbing, the electrical, all the utilities that came in along that roadway, and then turned and -- and went toward the -- the condominiums were the only utilities available for the -- for the condominium complex.  So, really, they were -- they were codependent, that you could not have had one without the other.

. . .

A.      . . . So the work performed by Konover . . . can be divided into categories of -- of work actually constructed on Lot 2, which includes the end of the driveway.  It's a square shape crosshatched that's above and slightly to the left of the pork chop [on the map].  That was constructed by Konover on . . . the Lot 2 property.  And the road coming from that . . . was constructed as a fire access road during Konover's construction, by Konover, to allow access to Pocono Road by both projects. . . .  [I]n addition, there was site work done on Lot 2 because Konover could not have stopped at the boundary line between Lot 1 and Lot 2.  In its excavation, you would have a cliff of 3 or 4 feet, obviously.  So Konover's work crossed over into Lot 2 to provide

for the common drainage of the property. They constructed, I believe, a retention pond, which is basically a -- a recess in Lot 2 that allowed the water to run from both Lot 1 and Lot 2 during a heavy rain and store there so that there wouldn't be any flooding of either properties.

There was work done on Lot 1 that was absolutely necessary to Lot 2. That includes the road, the utilities, many of the improvements. And then . . . on another level, . . . the construction of the property on Lot 1, the -- the assisted living facility, was absolutely necessary and a condition to the ability of the developer to build the condominium complex.

This town, Newtown, was opposed to the -- the construction of condominiums, and would only allow it because it was being built in conjunction with this elderly care facility. And it was being marketed that way as well. The -- the sale . . . and marketing of these two projects were together. There was a single letterhead. There was a single sales office, as I understand it. And the people that they were selling the condo units to were buying there or would -- would buy there based upon the fact that there was an assisted living facility. It was transition, . . . which is not an uncommon development where people late in life would buy a facility that would afford greater independence. But it was adjoining a facility that would have nursing facilities so that they could move and still have their spouse nearby.

Q.    Mr. Sheldon, all the work that you just described that was done on Lots 1 and Lots 2, that was either beneficial to Lot 2 or physically performed on Lot 2, how did that set of facts inform your client's legal position as to the validity of a mechanic's lien on Lot 2?

A.    That was all being done at the direction of the owner of the property as we understood it.

Q.    And was it your client's view that, as a result of all those facts, the lien on Lot 2 was legally valid under Connecticut law?

A.    Yes. The lien is valid as to both properties because it was being -- it was done at the direction and with the consent of the owner of both lots.

(Transcript at 20:15–34:9 (testimony of Attorney Sheldon).)

Attorney Sheldon also testified as to Konover's assessment of the HCN Debtor's damage

claim against Konover in respect of its filing of the allegedly invalid Konover Mechanic's Lien:

[O]ur argument was that, even assuming the lien were not valid, the [HCN] Debtor and related Debtors were in such poor financial shape that, regardless of the Konover

- 37 -

mechanic's lien, these Debtors were not going to succeed, and they would have -- and they would have suffered the same fate, in terms of arguably being in bankruptcy court regardless of Konover's mechanic's lien.

Q.     Would it be fair to characterize this section as your client's challenge to the causation . . . element of the affirmative claim against Konover?

A.     Yes, that's -- that's an accurate description.

Q.     And just to summarize, what was your client's view as to whether the [HCN] Trustee could prove causation in its affirmative claim against Konover?

A.     The [HCN] Trustee could not prove causation.

(Transcript at 36:18–37:15 (testimony of Attorney Sheldon).)

With respect to the S/J Motion, Attorney Sheldon testified in relevant part as follows:

Q.     Now, Mr. Sheldon, before we get to the -- to the merits of the summary judgment motion, did your client have a view as to whether it needed additional discovery in order to respond to that motion?

A.     It did.

Q.     And can you describe for the Court what your client's view was on that issue.

A.     We needed to conduct depositions and obtain documents in order to prepare our defense for the summary judgment motion.

Q.     And, in fact, the Court granted you permission to -- to conduct that discovery. Is that right?

A.     [It] did. . . .

Q.     And if you can just summarize, generally, what the scope of that -- what the magnitude of that discovery was.

A.     We had served depositions -- excuse me -- served subpoenas for depositions of Linda Silverstein [sic], who is the sole principal of both -- of both Debtors in this proceeding and also the sole principal of . . . [THN] with which Konover contracted.

We had a 30(b)(6) subpoena to the -- or a deposition notice to the [HCN] Trustee, and we had served subpoenas on a number of consultants who had worked

- 38 -

for all of the Silverstein [sic] entities, . . . [THN] and the two Debtors in this case, in particular.

Q.      In -- in total, how many depositions, approximately, did your client believe it needed to take to defend the summary judgment motion?

A.      We had planned to take and were -- were attempting to take a minimum of four depositions, with the potential being that the testimony in those could lead to an additional two depositions, potentially.

Q.      And was this discovery all the discovery that your client would need for the case, assuming it were to prevail on the summary judgment motion?

A.      No.  We . . . understood that we were proceeding only with the discovery necessary for the summary judgment motion and that additional discovery would take place after the Court denied the summary judgment motion. . . .

Q.      [C]an you tell the Court whether your client agreed with the summary judgment motion filed by the [HCN] Trustee.

A.      No, we did not.

Q.      And were there both legal and factual issues that you disagreed with?

A.      Yes.

Q.      And let's start with the factual issues.  Can you describe or tell the Court what your client's position was as to whether there were disputed issues of material fact regarding the summary judgment motion.

A.      Yes. I mean the facts that I've testified to already are contrary to the facts stated in the motion for summary judgment and -- and in the [S]tipulation that you filed today.  In particular, the facts related to where the work was performed, the [HCN] Trustee is operating under the understanding that work was not performed by Konover on Lot 2.  It was.  And -- and there's also a factual dispute as to whether the owner of Lot 2 gave its consent to the work being done by Konover on Lot 2 . . . .

Q.      Was it your understanding that the [HCN] Trustee's legal position on the motion for summary judgment was that there was no dispute of material fact regarding whether . . . the owner of Lot 2 had given consent or not to Konover?

A.      It was our understanding of the summary judgment that . . . the [HCN] Trustee was relying on that position.

- 39 -

Q.      And what's the relevance of the consent issue to whether the lien is valid?

A.      A mechanic's lien requires the consent of the owners to . . . be valid.  And consent can be given in a number of ways.

Q.      And what was your client's position as to whether or not the owner of Lot 2 had granted consent?

A.      We were certain that . . . consent was given.

Q.      And so it would have been fair to say that whether or not consent was given was, in your client's view, a disputed issue of material fact.

A.      It was.

Q.      And was that going to be . . . the centerpiece of your defense to the summary judgment motion?

A.      That was going to be a central issue.

(Transcript at 38:6–42:18 (testimony of Attorney Sheldon).)

Attorney Sheldon also testified with respect to the Mediation and other settlement considerations:

Q.      [D]oes the last sentence . . . [of the Mediation Position Statement] summarize the position that Konover took at the mediation?

A.      It does.

Q.      And what was that?

A.      That there was absolutely no validity to the claims and that there was no risk that the Trustee would prevail.

Q.      And in the context of the mediation, . . . would it be fair to say that initially there was a controversy as to who was going to pay whom between the Konover and the Trustee?

A.      There may have been a short-lived controversy.  Our position was immediately that we weren't even interested in talking if the scale of discussion was going to be that Konover didn't get paid.

- 40 -

Q.     And the current proposed settlement between the Trustee and Konover is for the Trustee to allow Konover to have a secured claim in the amount of $450,000.  Is that  right?

A.     Yes.

Q.     And -- and what was Konover's position at the mediation?  Was it for . . . [m]ore than the 450,000?

A.     Yes.

Q.     And at the end of the second mediation [session], did the parties reach agreement on the 450,000 number?

A.     No.

Q.     Instead, where were the parties at the end of the second mediation [session]? . . .

A.     I would say that they were far apart.

Q.     And what happened subsequent to the mediation to get the parties to the point where they were able to come together?

A.     Well, it's my understanding that the Trustee made efforts to obtain concessions from other creditors that allowed for a -- a better settlement offer to my client.

Q.     . . . Was Franklin . . . at the second mediation?

A.     They were.

Q.     And from your client's perspective, what was the importance of having Franklin at the second mediation?

A.     [I]t was our understanding that the offer to Konover would only increase if -- if other creditors, particularly the Franklin creditors, were willing to compromise what they were looking to take from the settlement.

Q.     And just to go back, your client's claim, in -- in your view, was senior to Franklin.  Is that right?

A.     It was.  It was senior to everyone.

                              . . .

Q.      [T]he Konover claim exceeded the amount of money in the . . . [HCN] estate. Is that right?

A.      It did . . . .

Q.      And would it be fair to say that the role of Franklin at the mediation and in the settlement, generally, was that any money going to Konover would reduce, dollar for dollar, the monies that would otherwise go to Franklin?

A.      That was my general understanding.

Q.      Now, did Konover agree to the $450,000 when it was first proposed?

A.      No.

Q.      And what happened in that regard?

A.      Our . . . firm recognized that the . . . [$450,000] was probably as high an offer as we would be able to obtain, and we agreed to compromise our fee to . . . make the net recovery to Konover greater and more attractive to them.

Q.      So by compromising your fee, the net recovery that your client ultimately achieved became acceptable to your client.  Is that right?

A.      Yes.

Q.      And can you, without going into the particular dollar number, give the Court a sense of the legal fees that your firm incurred over time to be?

A.      We've incurred hundreds of hours since we became involved in the case in . . . 2009.  The equivalent would be hundreds of thousands of dollars to contingency fee agreement.  So . . . to put it mildly, not a good deal for our firm.[39]

Q.      And in terms of if the case were not to settle and were [to] continue being litigated, have you given any sort of thought to an estimate as to what that cost would be for just your client?

A.      Hundreds of thousands.  The . . . volume of documents that we understood to be involved from the parties that . . . these consultants and from the Trustee were in excess of a hundred boxes of documents.  We expected that it was going to be a

---

[39]      The firm's original fee was a flat fee to be paid over two and a half years with a contingent fee component to it.  (*See* Transcript at 69:4-7 (testimony of Attorney Sheldon).)

very intensive discovery period, and -- and preparing for trial was going to require a -- a big investment.

. . .

Q.     And just in closing, . . . if you could just describe for the Court what your client's view is of the $450,000.

A.     They . . . see that as the . . . minimal amount that is . . . acceptable. . . . [I]t was . . . difficult . . . to get their agreement to this because they perceived that they have a valid lien in excess of the value of the estate, and if they proceeded to trial, that they would obtain a much greater recovery.

(Transcript at 43:3–49:7 (testimony of Attorney Sheldon).)

Attorney Sheldon testified on cross-examination that, to his knowledge, no one had done a dollar valuation of the work that Konover actually did on the Subject Property.  (*See* Transcript at 51:13-20 (testimony of Attorney Sheldon).)  Attorney Sheldon also testified that "there[] . . . [were not] any written, affirmative statements under the name of the Debtor [indicating that the HCN Debtor was going to pay for any of the work done on the Subject Property]."  (*Id.* at 57:20–58:4.)  However, Attorney Sheldon further testified that he believed that the HCN Debtor's  agreement to pay could be evidenced in other ways.  (*See id.* at 58:9–59:13.)

On redirect examination, Attorney Sheldon clarified that Konover's claim was not based solely on any actual work that Konover did on the Subject Property:

A.     Well, the fact that we performed actual work on Lot 2 makes our claim more supportive.  But the case law would support  the ability to -- to lien work performed on one lot, to the extent that it was beneficial to an entire subdivision.  There's . . . analogous cases, particularly involving condominiums, where work is done on a portion of a collective group of property and -- and the contractor was entitled to lien the larger quantity of . . . property within the subdivision or . . . grouping of . . . properties.

Q.     Would it be fair to say that your client's legal position in that regard and the Trustee's legal position in that regard were not consistent?

A.     It would appear so, yes.

- 43 -

Q.     We . . . had a disagreement on that legal issue.  Is that right?

A.     . . . And in fact, there is [Connecticut] Supreme Court precedent where work done off-site for the benefit of a project sustained a mechanic's lien.  There's a -- there's a significant Supreme Court case that came out, I think, in the last few years in which a -- off-site work, drainage work, I believe, performed as a requirement by the town was performed within the 90 days, and that was sufficient to maintain the lien, even though all on-site work had been performed prior to that 90-day lien period.

(Transcript at 71:11–72:18 (testimony of Attorney Sheldon).)[40]

With respect to HCN's consent to the placing of the Konover Mechanic's Lien on the Subject

Property, Attorney Sheldon testified on redirect in relevant part as follows:

Q.     And would it be fair to say that one of the disputes in this case was whether the . . . [HCN] Debtor consented to the lien being placed on . . . [the Subject Property]?

A.     Yes.  . . . and a major part of that is the fact that Linda Silverstein [sic] was the only equity holder and manager, member of both entities, and the fact that we believe this . . . contract describes the entire property as the property, both units.

Q.     So just to summarize again, one of the disputes that your client had with . . . my client is whether or not the . . . [HCN] Debtor had consented to a lien being placed on [the Subject Property].  Is that right?

A.     That was its view.

(Transcript at 73:1-16 (testimony of Attorney Sheldon).)

---

[40]     Konover cites in a post-trial brief *Pomarico v. Gary Constr., Inc.,* 5 Conn. App. 106, *cert. denied,* 197 Conn. 816 (1995) (discussed below).  (*See* Case # 04-30417 ECF No. 489 at 6.) Although Attorney Sheldon misidentified the *Pomarico* appellate court, *Pomarico* is the case he refers to above and is the "spreader" case referred to by Attorney Sheldon in his recross examination testimony.  (*See* Transcript at 74:14–75:1.)

B.     **The HCN Trustee**

The HCN Trustee testified that he had been involved with the HCN Case as chapter 7 trustee since the beginning of August, 2009.  (*See* Transcript at 78:8-14 (testimony of the HCN Trustee).) He has been a panel trustee in this District since 1997.  (*See id* at 112:5-16.)  During his tenure as a chapter 7 trustee, the HCN Trustee has been assigned approximately 1,000 chapter 7 cases per year. (*See id.* at 78:24–79:4.)

The HCN Trustee further testified that the first of the Mediation sessions was scheduled for November of 2009; the HCN Trustee spent much time and effort preparing for that session.  (*See* Transcript at 79:13–80:8 (testimony of the HCN Trustee).)  The HCN Trustee participated in the first Mediation session and in a second session held in March of 2010.  (*See id.* at 80:9-18.)

The HCN Trustee further testified with respect to the Konover Adversary Proceeding:

Q.     Now, focusing on the litigation between the Trustee and Konover, is it fair to separate it into what I would call two parts.  Part 1 is the objection to the lien, the mechanic's lien that Konover has filed on Lot 2, and the second part is an affirmative claim against Konover for money damages?

A.     Yes.  There's the claim objection.  And then, within the adversary proceeding, there was a claim for money damages.

Q.     Now, in connection with the validity of the lien, is there a summary judgment motion filed by our office, on your behalf, with respect to the lien validity?

A.     Yes.  The objection claim.

Q.     And you heard Mr. Sheldon's testimony this morning about Konover's position with respect to that. Is his testimony consistent with what your understanding was of Konover's position?

A.     I think he summarized it in a polite manner, yes.

(Transcript at 80:23–81:19 (testimony of the HCN Trustee).)

- 45 -

The HCN Trustee described the Mediation in his further testimony as "very contentious" and that "there was a lot of tension in . . . the air," (Transcript at 82:5-8 (testimony of the HCN Trustee)). He thought it "wise" to get Franklin involved with the second Mediation session because "the settlement funds that would be paid to Konover was [sic] really coming out of . . . [Franklin's] money." (*Id.* at 82:16-25.)  The HCN Trustee testified that if Konover prevailed on all of its arguments as to the Konover Mechanic's Lien, Konover would receive the entire HCN Cash Proceeds. (*See id.* at 83:19–84:3.)

The HCN Trustee testified as to his concerns about the cost of litigating the damages claim against Konover:

> Q.    Now, . . . in connection with the adversary proceeding against Konover, was the Trustee incurring legal costs?
>
> A.    A lot of legal costs.
>
> Q.    And in connection with the affirmative claim for money damages against Konover, was there a need for any expert testimony in connection with that claim?
>
> A.    You and Attorney Jim Burn, who was also representing me at the time, had advised me that there -- there would be need for an expert.
>
> Q.    And would that be in connection with a damages calculation?
>
> A.    Correct.
>
> . . .
>
> Q.    Was the affirmative claim against Konover for money damages premised on the fact that the mechanic's lien . . .  was the proximate cause of . . . -- the Debtor's bankruptcy.
>
> A.    Yes.
>
> Q.    And in connection with that claim, there would need to be a damages expert in order to value the Debtor in order to -- to put on evidence with respect to that claim.

> A.      What -- whatever the damage is.  If . . . someone to say that the project, as completed, would be worth 20 million, 15 million, whatever that dollar amount was, we needed to establish that, and that needed to be established through an expert witness.
>
> Q.      And -- and clearly that was going to cost the estate money.  Is that right?
>
> A.      I was told in excess of $100,000.

(Transcript at 84:23–86:18 (testimony of HCN Trustee).)

The HCN Trustee testified as to his doubts about succeeding against Konover on the damages

claim:

> Q.      Now, let's turn our attention to the claim against Konover for money damages.  And in order to recover on that claim, the Trustee would first have to establish liability.  Is that right?
>
> A.      Yes.
>
> Q.      And that goes back to the question of is the lien on Lot 2 valid or not.  Is that right?
>
> A.      Correct.
>
>                                    . . .
>
> Q.      But -- but in order to be successful, that issue would ultimately have to be determined in the Trustee's favor.  Is that right?
>
> A.      That's correct, yes.
>
> Q.      Now, without getting into too much of the detail, there -- there's also a causation issue. And you saw Mr. Sheldon raise in his [M]ediation [P]osition . . . [Statement] issues concerning whether the lien caused the demise of the Debtor.  Is that right?
>
> A.      I'm familiar with their argument, yes.
>
> Q.      And -- and was . . . the potential difficulty with that issue, is that one of the motivating factors, for you, in reaching a settlement in this case?

A.      Well, . . . I would have to show that that . . . the mechanic's lien was the proximate cause of -- of the downfall of the -- of the project. But . . . there was so many other issues.

. . . [T]he Debtor was behind on . . . the mortgage. It was in foreclosure. I know that the principal of the Debtor had -- had testified earlier.  There was deposition transcripts where she blamed . . . everybody else for the -- for the failure of the project. I know that . . . [Andrews] walked . . . off the project.

There's . . . so many other issues out there that I felt very uncomfortable in litigating this and believing that a -- a court would believe, at the end of the day, that -- that the mechanic's lien was the proximate cause of -- of the damages.  So to answer your question, yes.

Q.      And -- and absen[ce] of recovery on the affirmative claim, just to go back to your prior testimony, if all that is happening in the litigation is that the lien of Konover is disallowed, would that generate any recovery for unsecured creditors?

A.      No.  Not -- not only would I have disallow the lien, but I would need to hit an absolute grand slam, which I -- I don't believe I would be able to do in the affirmative recovery.  And that would be the only way that money could come into this estate, not only to pay unsecured creditors, but really to reach up into the Chapter 11 administrative scheme.

(Transcript at 90:9–93:9 (testimony of HCN Trustee).)

The HCN Trustee testified that he had further concerns about the Konover Mechanic's Lien

and the Franklin claims:

Q.      Now, if the claim -- going back to the two parts of the Konover [A]dversary [P]roceeding.  If the lien of Konover was merely disallowed and no affirmative recovery was recovered from Konover, what would be the effect on the estate, in terms of unsecured creditors?

A.      If the lien was . . . disallowed, I don't believe there would be any effect to the estate because there was another subsequent lien, the Franklin lien, which, again, exceeded all the money in the estate.

Q.      In the Franklin lien, there's a proof of claim filed by Franklin.  Is that right, in -- in your case?

A.      Yes.

- 48 -

Q.      And as you understand it, does that amount exceed, with postpetition interest, the dollars in the estate?

A.      It -- it does. And again, by far.

Q.      And effectively, the postpetition interest only can get up to the value of the collateral in the estate.  Is that right?

A.      That's correct.

Q.      But -- but if you calculated all the interest claimed by Franklin, it would exceed . . . the value of cash in the estate.  Right.  Would it be fair to say that there was a significant interconnection, if you will, between the Konover mediation and -- and the Franklin claim and their role in the mediation?

A.      Again, I -- the way I looked at [it] -- is they were paying out of their security interest the money to satisfy Konover.  That's why they were such a crucial part of the second mediation.

Q.      Now, did Konover also have a claim in the . . . [NP Case]?

A.      Yes.

Q.      And that was an unsecured claim.  Is that correct?

A.      That's correct, yes.

Q.      And -- and did Franklin also have a claim in the . . . [NP Case]?

A.      Another unsecured claim.

Q.      Another unsecured claim.  And so, can you describe for the Court the -- the effect of having those two parties with claims in the . . . [NP Case] on the overall mediation and -- or potential settlement.

A.      . . . I filed many global compromises of claims but none like this.  There were so many moving parts,  so many different parties, that it -- it truly was a global compromise between two -- two bankruptcy estates that were interconnected and had similar creditors.

Q.      And -- and just to delve into that a little bit more, in order to make a payment to Konover, Franklin had to be in agreement with that.  Is that right?

A.      Yes.

Q.      And for Franklin to be in agreement to make any payment to Konover, did Franklin want to know how much it was going to get paid in turn?

A.      It . . . wanted to know what the bottom line number would be to it after deduction of all fees, costs, administrative claims, everything that would be coming out of my estate and Attorney Napolitano's estate.  Yes.

Q.      In other words, to get to the bottom line numbers, you put it, for Franklin, you needed to look at what Franklin would get out of both estates.  Is that right?

A.      Yes.

Q.      And -- and part and parcel of that was having Konover give up its claim in the Nuevo Pueblo estate.  Is that right?

A.      That's part of the settlement, correct.

(Transcript at 86:20–90:5 (testimony of HCN Trustee).)

The HCN Trustee further testified as to certain other aspects of the Global Compromise:

Q.      First of all, although it's obviously of record, the proposed settlement amount to Konover is $450,000.  Is that right?

A.      Yes.

Q.      And would it be fair to say that that was not where you started in the mediation?

A.      No.  We started asking for a large sum of money, and that did not go anywhere.

Q.      And in your view, given all the back and forth at the mediation, is it fair to say that the $450,000 was sort of a necessary payment to Konover in order to reach an agreement?

A.      Yeah.  I'm confident that . . . they would not have accepted an amount less than $450,000.

Q.      Did -- did you try to get a lesser amount?

A.      Oh, absolutely.

- 50 -

Q.      And -- and that was met with how much success?

A.      None.

Q.      Now, in addition to the $450,000 payment to Konover, Konover also withdraws its claim in the . . . [NP Case].  Is that right?

A.      Yes.

Q.      Which then frees up money to be able to go to Franklin [from the NP Case]. Is that right?

A.      That's correct.

Q.      Now, in connection with Franklin, there's also some affiliates of Franklin that are involved in this.  Is that correct?

A.      Yes.

Q.      We have MIX Avenue, LLC [and Eli Whitney and NHMR].

Q.      And there are adversary proceedings that Reid and Riege, on the Trustee's behalf, have against both MIX Avenue and Eli Whitney, in your case.

A.      Right. . . .

Q.      And in the settlement that is reached back then and that is part of the current motion, it's effectively that . . . [the Mix and Eli Whitney] claims get withdrawn --

A.      That's correct.

Q.      -- as against your estate.  Is that right?

A.      Yes.

Q.      And -- and there's also an adversary proceeding against Franklin that Reid and Riege had against Franklin in your case.  Is that right?

A.      Yes.

Q.      And that adversary proceeding gets withdrawn by the [HCN] Trustee.  Is that right?

A.      That -- that dispute also gets resolved, yes.

- 51 -

Q.      And has both the prior Trustee and in your view . . . [the HCN] Trustee, been advised by Reid and Riege in connection with those three other adversary proceedings?

A.      Yes.

. . .

Q.      Now, going back to the . . . settlement itself, we've already talked about the payment to Konover and the withdrawing of the Konover claim.  Is there also a payment to the Town of Newtown?

A.      Yes. I believe it's $99,000.

Q.      And are they -- as part of that agreement, agreeing not to -- to ask for or take any additional interest on that claim?

A.      That's correct, yes. . . .

Q.      And -- and there's also a payment being proposed to . . . [NHMR].  Is that right?

A.      That's correct.

Q.      And is that an affiliate of Franklin, as you understand it?

A.      Yes.

Q.      And is . . . [NHMR] the assignee of the mortgage of New Haven Savings Bank?

A.      Yes.

Q.      And they -- they have a proof [of claim] on file.  Is that right?

A.      They do.

Q.      And in that -- as part of the global settlement, is . . . [NHMR] waiving any additional interest or fees on its secured claim?

A.      They are.

Q.      And so there's a payment being proposed to them.  Correct?

- 52 -

A.      Which was the same payment being proposed a while ago.

Q.      And -- and if -- if they were not willing to waive that, they would be entitled
to additional postpetition interest and fees.  Is that correct?

A.      A lot more, correct.

Q.      And -- and then, under the settlement, Franklin is proposed to get
approximately a million three from . . . [the HCN] estate.  Is that right?

A.      That's right.

Q.      And as you understand it, their secured claim is for a million four plus
accrued interest.  Is that right?

A.      Right.  The accrued interest. . . . adds up to four [sic] more than $1.4 million.

Q.      And there's been some suggestion . . . prior to today's hearing, that perhaps
the Franklin claim should only be $1.1 million.  Are you familiar with that?

A.      I'm familiar with that, yes.

Q.      In other words, the principal balance should be 1.1 instead of 1.4.

A.      From my perspective, it doesn't matter.

Q.      And is that because the postpetition interest would still exceed the amount in
the estate?

A.      Correct. Plus . . . there's an additional claim that . . . exceeds all . . . the
money in the estate.  Plus we add up all the other administrative claimants and money
coming out of the estate, . . . there's just not enough money in . . . [the HCN] estate
to . . . satisfy that . . . particular claim.

(Transcript at 93:14–99:17 (testimony of the HCN Trustee).)

The HCN Trustee further testified as to the effect of the Global Compromise on

administrative claimants in the HCN Case:

A.      All of the attorneys who represented the estate, everyone . . . who ultimately
would be looking for fees in this estate, have agreed to take an . . . an amount less
than they're entitled to.

- 53 -

> Q.     And it's all subject to fee applications being --
>
> A.     Subject to bankruptcy court approval.
>
> Q.     Right.  And -- and if . . . by chance, the fee application that the Court approved, ended up being less than the settlement amount --
>
> A.     It would save Franklin some money.  That money would ultimately go to Franklin.
>
> Q.     But the assumption is that because people have already comprised their fees, that the fee applications will not end up being less than the settlement . . . amount. Is that right?
>
> A.     Yes.

(Transcript at 100:3–101:1 (testimony of the HCN Trustee).)

The HCN Trustee testified as to his opinion concerning the consequences to the HCN estate of not approving the Global Compromise:

> Q.     Now, if the settlement and the payment to Konover were -- were not to be approved, what -- what would be . . . the effect on the estate, in terms of what has to happen at that point?
>
> A.     Well, I would have to continue this -- the two components of litigation before the court.
>
> Q.     And we would have to do the discovery that Mr. Sheldon testified to. Correct?
>
> A.     Right. . . . [A]t one point, he was talking about . . . having a one-year discovery deadline, so -- and I also heard him testify as -- as to the amount of money that his firm would need to expend in order to -- to do all that discovery. And I would only assume that -- that my counsel would also be -- would cost them several hundred thousand dollars of -- of additional fees during that time period, even prior to trial.

(Transcript at 101:2-23 (testimony of HCN Trustee).)

The HCN Trustee explained why he believed the Global Compromise was "fair and equitable" to the HCN estate:

A.    . . . I spent countless hours doing the math, reviewing this in . . . every way that I thought . . . was reasonable, and . . . I think what is before the Court today is the best possible option that's out there.

Q.    And . . . clearly, if the case were to continue to be litigated, is there any certainty of outcome, in your judgment?

A.    I . . . think that would be a lose-lose proposition to all parties.

Q.    And would it be fair to say that if the case were to continue to be litigated, there would be a significant time delay in . . . going through that process?

A.    Absolutely.

Q.    And would it be also fair to say that, in your judgment, the issues and, quote [sic], the Konover adversary proceeding and -- and the settlement, as a whole, are complex in nature?

A.    Very complex, yes.

(Transcript at 102:2-24 (testimony of HCN Trustee).)  On cross-examination, the HCN Trustee testified that he had explored the issues of eliminating the Konover claim in its entirety and of minimizing the Franklin claim but still supported the Global Compromise.  (*See* Transcript at 109:19–110:24 (testimony of HCN Trustee).)

## C.    The NP Trustee

The NP Trustee testified that she had been a lawyer since 1982 and had been a panel trustee in this District since May of 1997.  (*See* Transcript at 114:4-12 (testimony of NP Trustee).)  During her time as panel trustee, she had handled in that capacity about 13,500 cases.  (*See id.* at 114:16-19.)  The NP Trustee further testified that she had reviewed documentary evidence and was satisfied that the initial principal amount of the Franklin claim against the NP estate was $1,249,993.00.  (*See id.* at 118:5–119:13; *see also id.* at 127:8–132:1.)  The NP Trustee further testified that she did not participate in the Mediation *per se.*  (*See id.* at 122:17-18.)  Rather she "attended . . . an [earlier]

- 55 -

informal mediation . . . in an attempt to reach a global settlement of the Konover claim . . . [a]nd that was completely unfruitful," (*id.* at 122:18-24).

The NP Trustee testified as to why she supported the Global Compromise:

Q.    Okay. So beyond those obvious benefits [*i.e.,* withdrawal of claims described above], are there any other benefits to the settlement that you perceive?

A.    Well, the most obvious benefit to me would be that this is a seven-year-old case.  And the purpose of the Chapter 7 case is to liquidate quickly and . . . I'm supposed to get something to creditors as quickly as possible.  And the sooner this is resolved, I believe, the better.

Q.    So you've been . . . impeded from making a distribution because --

A.    Of the Konover claim.

Q.    . . . You're aware that under the settlement agreement, as it presently stands, more is being paid to Franklin in the Homesteads case than is being paid in the Nuevo case.  Is that correct?

A.    That's correct.

Q.    Okay.  And would your understanding of contribution laws be that that estate, . . . [HCN], would have a claim back against the Nuevo case for its disparate share that's being paid?

A.    Yes. . . .

Q.    . . . Is . . . the potential contribution claim of . . . [the HCN estate], because of its overpayment . . . in the . . . [HCN C]ase sharing, in any way, in your case?

A.    No.

Q.    Okay. Is the settlement fair and reasonable from your perspective?

A.    It is.

(Transcript at 125:5–126:22 (testimony of NP Trustee).)

## VII.   ANALYSIS

The Global Compromise has two primary components: a settlement between the HCN Trustee and HCN's relevant creditors; and a settlement between the Trustees.  Both are considered below.

### A.   Settlement between the HCN Trustee and HCN's Creditors

#### 1.   "Reasonableness" of the Global Compromise with Respect to the HCN Case

The only aspects of the settlement between the HCN Trustee and HCN's creditors raised by the Debtors are the payments to Konover and Franklin and the HCN Trustee's waiver of inter-entity claims (*e.g.,* contribution claims for payments to Franklin) against the NP estate.  All three will be discussed below.

##### a.   Konover

###### (i)   Affirmative Recovery by the HCN Estate

To the extent that the Debtors previously contended in opposition to the Global Compromise that the HCN Trustee should not be paying Konover but, rather, Konover should be paying the HCN Trustee, the Debtors have abandoned that argument at the Hearing and in their post-trial briefs by not raising the issue.  (*See, e.g.,* Transcript at 110:5-13 (cross-examination of HCN Trustee by counsel for the Debtors).)

In any event, the HCN Trustee testified at the Hearing that he believed that he would have difficulty establishing the necessary elements of causation and damages to prevail on an affirmative recovery claim against Konover.  (*See* Transcript at 90:9–93:9 (testimony of HCN Trustee).)  The HCN Trustee further testified that the subject litigation would have been expensive and protracted. (*See id.* at 84:23–86:18; 101:2-23 (testimony of HCN Trustee).)  Moreover, the HCN Trustee tried

to pursue affirmative recovery from Konover in the Mediation and was rebuffed in no uncertain

terms. (*See id.* at 43:11-20 (testimony of Attorney Sheldon).)  Based upon the record here, the court

finds to be reasonable the HCN Trustee's decision not to attribute any material value to the

affirmative recovery claim against Konover.

### (ii)      **Konover Mechanic's Lien**

The Debtors argue that the Konover Mechanic's Lien fails as a matter of law because

(1) Konover did no work on the Subject Property and/or has failed to prove up the value of such

work and (2) the HCN did not consent to be liable for the work done on the THN Property.  Further,

the Debtors argue that those issues would have been disposed of adversely to Konover in the context

of the S/J Motion.  Those arguments are considered below.

### (A)      **"Blanket" Mechanic's Liens in General**

Section 49-33(a) of the Connecticut General Statutes provides as follows:

> (a) If any person has a claim for more than ten dollars for materials furnished or
> services rendered in the construction, raising, removal or repairs of any building or
> any of its appurtenances or in the improvement of any lot or in the site development
> or subdivision of any plot of land, and the claim is by virtue of an agreement with or
> by consent of the owner of the land upon which the building is being erected or has
> been erected or has been moved, or by consent of the owner of the lot being
> improved or by consent of the owner of the plot of land being improved or
> subdivided, or of some person having authority from or rightfully acting for the
> owner in procuring the labor or materials, the building, with the land on which it
> stands or the lot or in the event that the materials were furnished or services were
> rendered in the site development or subdivision of any plot of land, then the plot of
> land, is subject to the payment of the claim.

Conn. Gen. Stat. Ann. § 49-33(a) (West 2012).

> Under . . . § 49-33(a), the consent required from the owner . . . is more than
> the mere granting of permission for work to be conducted on one's property . . . or
> the mere knowledge that work was being performed on one's land . . . . The consent
> meant by the statute must be a consent that indicates an agreement that the owner of
> at least the land shall be, or may be, liable for the materials or labor.

- 58 -

> Whether the . . . [owner] consented to the performance of the . . . [contractor's] work is a question of fact.

*Waterview Site Servs., Inc. v. Pay Day, Inc.,* 125 Conn. App. 561, 566 (2010), *cert. denied,* 300 Conn. 910 (2011) (citations and internal quotation marks omitted).

> Under the language of § 49-33(a), the plaintiff ha[s] a choice of filing a blanket lien against the plot of land that had been subdivided, or filing liens against the individual lots to secure sums due for improvements to each lot. When the plaintiff . . . [chooses] to proceed against individual lots, he limit[s] himself to claiming in each lien an amount commensurate with the materials furnished and services rendered to improve each individual lot.

*Butch v. Thangamuthu,* 37 Conn. App. 547, 550 (1995).

The Debtors cite *Butch* for the proposition that even if a blanket lien is filed, the contractor must prove "the value of the services rendered, lot by lot . . . ," (Case # 04-30417 ECF No. 482 at 8 (Debtors' initial post-trial brief)). That is a misstatement of the holding in *Butch.* In fact, the contractor did not prevail in *Butch* because he had *failed* to file a blanket lien and thus was required to (and had failed to) prove up value on a lot by lot basis. *See Butch,* 37 Conn. App. at 550-51 (rejecting contractor's argument that three separate mechanic's liens could be aggregated into a statutory blanket lien).

*Pomarico,* 5 Conn. App. 106, is more to the point. In *Pomarico,* the contractor filed a blanket lien for work done at the insistence of the city which work was performed on one lot in the subdivision but arguably benefitted all lots in the subdivision. The *Pomarico* court analyzed the situation as follows:

> The defendant believed that his task was completed on December 7, 1982, but, at the demand of the city inland wetland agency, returned to perform work on the level

> spreader[41] which was completed on January 14, 1983. The level spreader is located
> in the vicinity of lot No. twenty-six, and was of value to every lot in the subdivision.
> All lots in the subdivision will benefit from the erosion protection provided by it.
> We are equating the demand of the city inland wetland agency as work performed for
> the benefit of the whole development. Hence, the lien falls within the site
> development purview of General Statutes § 49-33, as amended. We conclude that
> the filing of the [blanket] mechanic's lien on March 14, 1983, complied with General
> Statutes § 49-34.

*Pomarico,* 5 Conn. App. at 111 (footnote omitted). Thus, *Pomarico* stands for the proposition that

work performed only on one lot in a subdivided plot can be a proper subject for a blanket mechanic's

lien on all lots in the subdivision when the work benefitted the entire subdivision. *Pomarico* also

stands for the proposition that, at least under certain circumstances, benefit to all lots will be

presumed when the work was undertaken pursuant to a governmental demand.

### (B)   Summary Judgment (In General)

"Summary judgment is appropriate only if the pleadings and submissions . . . show that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law." *The Andy Warhol Foundation for Visual Arts, Inc. v. Hayes (In re Hayes)*, 183 F.3d

162, 166 (2d Cir. 1999). *See also* Fed. R. Civ. P. 56(c) (made applicable by Fed. R. Bankr. P. 7056).

The movant bears the burden of establishing the absence of any genuine issue of material fact. *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("T[h]e burden

on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to

support the nonmoving party's case."). The court must view all ambiguities and draw all reasonable

inferences in the light most favorable to the nonmovant. *See Novak v. Blonder (In re Blonder)*, 246

B.R. 147, 150 (Bankr. D. Conn. 2000) (Krechevsky, J.). Ultimately, the role of the court is "not . . .

---

41      The *Pomarico* opinion gives a description of a "level spreader" at note 3 thereof. (*See id.* at 111.)

to weigh the evidence and determine the truth of the matter but to determine whether there is a

genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986).  However,

> in most situations in which the moving party seems to have discharged his burden of
> demonstrating that no genuine issue of fact exists, the court has discretion to deny a
> Rule 56 motion.  This is appropriate since even though the summary-judgment
> standard appears to have been met, the court should have the freedom to allow the
> case to continue when it has any doubt as to the wisdom of terminating the action
> prior to a full trial.

10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*

§ 2728 at 525-26 (3d ed. 1998) (footnotes omitted).  *Accord Liberty Lobby, Inc.,* 477 U.S. at 255;

*Lind v. United Parcel Service, Inc.*, 254 F.3d 1281, 1285 (11th Cir. 2001).

### (C)      Probable Disposition of S/J Motion

There are two issues raised by the S/J Motion:  whether *Pomarico* can be extended to validate

the Konover Mechanic's Lien; and the "consent issue."  The court would have declined to consider

whether *Pomarico* could be applied to this situation on a summary judgment motion.  Rather, the

court would have deferred decision until a full record had been developed at trial.  Moreover, as

noted above, the issue of consent by the owner is a question of fact not suitable for disposition by

summary judgment.  That is especially true here where it has been alleged that Linda Silberstein was

often not careful about distinguishing the THN Debtor from the HCN Debtor.  (*See, e.g.,* A.P. # 04-

3037 ECF No. 55 at 5-9 (Konover's counterclaim to "pierce the corporate veil" between (*inter alia*)

the THN Debtor and the HCN Debtor).)

For the reasons discussed above, the court finds that the HCN Trustee's fears that the

Konover Adversary Proceeding would produce protracted and expensive litigation (*see* Transcript

at 84:23–86:18, 101:2-23 (testimony of the HCN Trustee)) are reasonable.  For the same reasons,

the court does not criticize the HCN Trustee's decision not to prosecute the S/J Motion (and to incur

the expense related thereto).

### (D)   Amount of Settlement with Konover

If it were upheld, the Konover Mechanic's Lien claim would have a maximum value of about

$2,700,000 (*i.e.,* $2,800,000 in HCN Cash Proceeds less the $99,000 tax lien).  *Cf.* 11 U.S.C.

§ 506(a), (b).  The proposed payment to Konover represents a discount of approximately eighty-three

(83%) percent from that maximum claim.  As discussed above, the court finds to be reasonable the

HCN Trustee's decision not to prosecute either the affirmative recovery against Konover or the S/J

Motion.  The court further finds to be reasonable the HCN Trustee's fears concerning protracted and

expensive litigation with Konover and the fact that the HCN Sale Proceeds are earning "negative

interest."  Further, based on the testimony set forth above, the court believes that the settlement with

Konover was the best that the HCN Trustee could obtain under the circumstances.  For all of the

foregoing reasons, the court finds the proposed settlement of the Konover Mechanic's Lien to be

reasonable (although possibly on the "high end" of reasonable) and a sound exercise of the HCN

Trustee's business judgment.

### b.   Franklin

Pursuant to the Global Compromise, Franklin is to be paid $1,354,213.40 from the HCN

Case.  The Debtors concede that the original principal amount of Franklin's claim was no less than

$1,100,000.  The Debtors do not dispute that nine (9%) percent per annum is an enforceable interest

rate.  Taking a very conservative approach, simple interest at nine percent on $1,100,000 for ten

years (*i.e.,* from the date of default) is approximately $990,000.  That plus $1,100,000 yields

approximately $2,090,000.  Moreover, in its claim objection, the HCN Debtor concedes that a

distribution in the amount of $1,326,000.00 would be proper.  (*See* Case # 04-30417 ECF No. 506 at 2.)  Accordingly, a payment from the HCN estate to Franklin of $1,354,213.40 would not be unreasonable under the circumstances present here.

### c.      Waiver of Right of Contribution

The reasonableness of the HCN Trustee's waiver of rights against the NP estate is analyzed with the reasonableness of the settlement between the Trustees which is discussed below.

### B.      Settlement Between the Trustees

Analysis of the fairness of the Global Compromise between the Trustees *inter se* is more complex.

### 1.      Proper Credit Against Franklin's NP Claim/ Method of Allocation of Postpetition Interest

The analysis must begin with the proposed distribution to Franklin in the HCN Case.

| | | |
|---|---|---|
| HCN Sale Proceeds on hand | $2,787,227.00 | |
| Senior Liens | ($435,513.65)[42] | |
| | | |
| Amount Available for Distribution to Franklin | $2,351,713.35 | |
| | | |
| Carve-Outs | ($997,500.00)[43] | |
| | | |
| Actual Distribution to Franklin | $1,354,213.35 | (the "Franklin HCN Distribution") |

---

[42]      Tax lien of Town of Newtown plus NHMR Mortgage.

[43]      The Carve-Outs are as follows: $450,000 to fund the Konover settlement; $20,000 to fund the Andrews Settlement; $520,000 for the Trustee's commission and professional fees (assuming maximum amount approved); and $7,500 for the "contingency reserve" (assuming all used).  The proponents described these distributions to Konover, Andrews, the HCN Trustee, the relevant professionals and the "contingency reserve" as "carve-outs" at the Further Hearing.  (*See* Further Transcript at 46:16–47:2 (remarks of Attorney Kinsella).)

The Global Compromise provides that Franklin's general unsecured claim in the NP Case is $1,733,274.50 (the "Franklin NP Claim"). However, the Global Compromise contemplates that, to achieve what amounts to a distribution base for Franklin in the NP Case, the Franklin NP Claim will be adjusted downward by the amount of the Franklin HCN Distribution allocable to the amount of the Franklin HCN Claim as of the filing of the petition. That, the Trustees say, is approximately $670,000 (with approximately $680,000 allocable to postpetition interest on the Franklin HCN Claim). That would give Franklin a distribution base in the NP Case of approximately $1,063,000. As discussed below, that is not the only potential allocation of postpetition interest which could be used.

The Debtors dispute the foregoing, arguing that the Carve-Outs are being treated in the Global Compromise as senior secured claims. That, the Debtors assert, renders the Franklin HCN Claim an undersecured claim upon which postpetition interest does not accrue. *See* 11 U.S.C. §§ 502(b)(2), 506(b). Therefore, the Debtors argue that the entire Franklin HCN Distribution must be applied against Franklin's claim in the NP Case, leaving a distribution base of approximately $380,000.00 ($1,733,274.50 - $1,354,231.35 = $380,000 approx.), not $1,063,000 (approx.).

The Trustees dispute the foregoing by asserting that, under the Global Compromise, the Carve-Outs are not senior liens but, rather, are "carve-outs" from Franklin's lien in the HCN Case. A "carve-out" is a waiver of lien as to specific collateral generally for the benefit of specific creditor(s). *See e.g., Costa v. Robotic Vision Sys., Inc.* (*In re Robotic Vision Sys., Inc.*), 367 B.R. 232, 237 n.23 (BAP 1st Cir. 2007) ("[A] 'carve-out agreement' is generally understood to be an agreement by a party secured by all or some of the assets of the estate to allow some portion of its lien proceeds to be paid to others, *i.e.,* to carve out of its lien position. The carve out is intended to

- 64 -

guarantee that a lien . . . will not reach certain funds, usually up to a maximum dollar amount . . . ." (citations and internal quotation marks omitted)).  Accordingly, the Trustees' "carve out" argument is persuasive.  However, that conclusion really does not resolve the dispute.  That is because the Trustees' method for allocation of postpetition interest is (as noted below) not the only possible allocation method.

The allocation of the Franklin HCN Distribution urged by the Trustees (about $670,000 to prepetition claim and about $680,000 to postpetition interest) assumes that *no* postpetition interest was paid with respect to the Carve-Outs.  That assumption would produce the $1,063,000 distribution base for Franklin in the NP Case as urged by the Trustees.

However, it could be argued that *all* of the postpetition interest was paid with respect to the Carve-Outs.  Using that allocation, since all the postpetition interest would be deemed paid in respect of the Carve-Outs, Franklin's distribution base in the NP Case is $380,000 (approx.), not $1,063,000.[44]  Moreover, approximately $63,000 of Franklin's claim in the NP Case is attributable to the additional prepetition interest which accrued only on its claim in the NP Case subsequent to the filing of the HCN Case.   Once that $63,000 is "backed out" of Franklin's NP Case distribution base, it seems likely that the remaining $1,000,000 (approx.) distribution base in the NP Case functions as reimbursement to Franklin for its payment of the Carve-Outs.[45]

---

[44]      $1,733,274.50 (Franklin prepetition claim in the NP Case) – $1,354,213.35 (Franklin HCN Distribution (all prepetition claim)) = $380,000 (approx.).

[45]      As noted above, at the Further Hearing Franklin agreed to subordinate its claim to the claims of NP's other general unsecured claims.  Were that not so, under the Global Compromise NP's general unsecured claims (including Franklin's claims) would be paid at a rate of approximately ninety-six (96%) percent.  (*See* Case # 04-30417 ECF No. 507 at 2 (Response No. 6); Further Transcript at 14:16–15:16 (remarks of Attorney Baker).)  Thus, a distribution base of $1,000,000 (approx.) would yield a distribution to Franklin roughly approximate to the amount of

What the court still lacks is a cogent explanation of why, in the context of the Global Compromise, it is reasonable for the NP Trustee to agree to the foregoing.

### C.   "Informed Decision" by the Trustees

As noted above, the essential element of the settlement between the Trustees is that the NP estate will compensate Franklin for the Carve-Outs.  Other than a desire to close her case without further diminution of the NP estate (a valid concern), the NP Trustee's testimony at the Hearing was notably lacking in explanation as to why the NP Trustee had decided that it would be reasonable for the NP estate to fully compensate Franklin for the Carve-Outs.  Various issues have been alluded to by the Trustees and Franklin at the Hearing and in the pleadings including the legal right of Franklin to pursue both estates to satisfy its claims, potential for substantive consolidation of the two estates and waiver of inter-estate claims (*e.g.*, contribution).  However, the record does not sufficiently disclose how those issues (or any other issue besides expediency) factor into the settlement between the Trustees.  Finally, the court is not yet persuaded that the NP Trustee (or the HCN Trustee) has made an informed decision as to the reasonable settlement value of the Franklin claim.[46]

As discussed above, to approve a proposed settlement as "reasonable," the court must be persuaded that the trustee properly has identified the relevant issues and has made an informed decision with respect to them.  Taking into consideration the record made to date, the court is not persuaded that the proposed settlement between the Trustees is reasonable.

-------

the Carve-Outs.

[46]      The HCN Trustee freely admitted that "[f]rom . . . [his] perspective, [the foregoing] . . . doesn't matter." (Transcript at 99:5-6.)  Given the HCN Trustee's waiver of the contribution claim, that may not be a valid position for him to take.

## VIII.  <u>CONCLUSION</u>

As noted above, the Global Compromise has two primary components: a settlement between the HCN Trustee and HCN's relevant creditors; and a settlement between the Trustees.  For the reasons discussed above, the court is persuaded that the settlement between the HCN Trustee and the HCN's relevant creditors is reasonable.[47]  However, based on the record as it now stands, the court cannot now conclude that the settlement between the Trustees is reasonable.  Because of the age of these cases, the real possibility of further diminution of the estates and the complexity of the Global Compromise, the court will afford the Trustees one last opportunity to persuade the court.  Accordingly, the court hereby exercises its discretion to reopen these proceedings to permit the Trustees to supplement the record with additional testimony and/or evidence.  A separate scheduling order will issue.

It is **SO ORDERED.**

Dated: August 21, 2012                                      BY THE COURT

**Lorraine Murphy Weil**
Chief United States Bankruptcy Judge

---

[47]    If the Global Compromise later is approved in its entirety, an analysis using the *Iridium* Factors as to the Global Compromise in its entirety will be set forth in that opinion.